**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

DUSTIN HERBST,

        Defendant.

No. 17-CR-4059-LTS

**REPORT AND RECOMMENDATION**

_____

### *Table of Contents*

*I.* **BACKGROUND** ................................................................................................... 3

*II.* **DISCUSSION** .................................................................................................. 10

  *A.* *The Initial Traffic Stop* ................................................................... 10

  *B.* *The Search of the Safe* ................................................................... 12

    *i.* *Odin's Certification and Training* ...................................... 14

    *ii.* *Odin's Proficiency* ............................................................. 15

    *iii.* *Circumstances of this Particular Sniff* ............................. 19

  *C.* *Omission of Failure to Indicate in Search Warrant Affidavit* .................... 26

  *D.* *Search of the Cell Phone and Electronic Devices and the Good Faith Exception*
    29

*III.* **CONCLUSION** ................................................................................. 33

This matter is before the court on Defendant Dustin Herbst's motion to suppress evidence (Doc. 28), which the Government resists (Doc. 35). I conducted a hearing on the motion on December 7, 2017. Doc. 42. The Government presented the testimony of Detective Dylan Grimsley, Office Julian Loera, Officer Jacob Noltze, and expert witness Michael Morgan. Herbst presented the testimony of expert witness Jim Pauley. The following exhibits were also received in evidence without objection:

| Exhibit No. | Description |
|---|---|
| 1 | video (Sergeant Hoogendyk's patrol vehicle) |
| 2 | certification records (K-9 Odin) |
| 2A | training records (K-9 Odin) |
| 2B | Dogs for Law Enforcement Bylaws & Certification Rules |
| 3A | photograph (intersection at Rustin & Paxton streets) |
| 3B | photograph (close up of Exhibit 3A) |
| A | video (Officer Loera's patrol vehicle)[1] |
| B | Drug Enforcement Administration interview report |
| C | Sioux City Police reports |
| D | state search warrant & application |
| E1-E17 | excerpt of training records (K-9 Odin) |
| F | Curriculum Vitae of Jim Pauley |
| G | Google map printout |
| GG | Google map printout (Exhibit G with handwritten notations) |

Herbst seeks to suppress evidence seized on August 12, 2017, arguing (1) that officers lacked justification to stop his vehicle; (2) that the K-9 sniff failed to provide probable cause to search a safe found inside the vehicle; and (3) that officers lacked probable cause to search a cell phone and two thumb drives seized from the vehicle. The Government argues in its resistance (1) that Herbst's traffic violation provided probable cause to stop the vehicle; (2) that the K-9 sniff provided probable cause to search the vehicle and safe for narcotics, and officers had probable cause to search the vehicle and safe for weapons; and (3) that the warrant to search the cell phone and thumb drives was supported by probable cause, and the officer relied in good faith upon the warrant.

---

[1] The audio on this exhibit does not begin until approximately nine minutes and forty-three seconds (9:43) into the video, and subsequent portions of the video do not contain audio.

For the reasons stated below, I recommend **denying** the motion to suppress.

# I. BACKGROUND

On August 12, 2017, Detective Dylan Grimsley[2] with the Sioux City Police Department (SCPD) received information from a confidential informant (CI)[3] about a source of significant quantities of drugs in the Sioux City area.[4] The CI provided Detective Grimsley with the following information about the source:

- His name was Dustin, and he was a white male with a reddish-colored beard;

- Dustin was staying at a residence in the 1300 block of south Paxton Street in Sioux City, which the CI described;

- Dustin drove a gold-colored Toyota car with Colorado license plates and a dent in the rear bumper;

- He had brought significant quantities of methamphetamine and possibly cocaine from Colorado to be distributed in the Sioux City area; and

- He stored methamphetamine and cocaine in a safe, which he always carried in his vehicle; he carried the safe because he believed police would be required to obtain a warrant to search the safe.

Approximately three hours after receiving this information, Detective Grimsley located the residence described by the CI and began conducting surveillance from

---

[2] As a detective assigned to the Special Investigations Unit, Detective Grimsley investigates offenses involving drugs, prostitution, and related offenses, and he works in plain clothes (rather than a police uniform) and often in an undercover capacity. He has been assigned to the Special Investigations Unit for two years and was previously assigned to patrol, having worked for the SCPD a total of five years. Detective Grimsley completed law enforcement training, including narcotics investigation training, as well as a bachelor's and master's degree.

[3] The CI was providing information to law enforcement for consideration on felony drug charges. The CI had provided information in the past that led to seizures of stolen property, drugs, and contraband, as well as arrests of and charges against other individuals for drug and firearm offenses. Accordingly, Detective Grimsley believed the CI was reliable.

[4] The Drug Enforcement Administration had received similar information on August 4, 2017, from a separate confidential informant. *See* Ex. B. It is unclear, however, whether on August 12, 2017 (the date in question here) Detective Grimsley or the other SCPD officers were aware of that additional information.

approximately one block away. Detective Grimsley was working alone that day, driving his unmarked law enforcement vehicle, which did not have police lights or a siren. Detective Grimsley saw a gold Toyota Corolla with Colorado license plates (the Toyota) parked directly in front of the residence. Approximately one hour later, Detective Grimsley saw an individual (later identified as Herbst) get into the back seat and then the trunk of the Toyota. It appeared he moved items around for a couple of minutes in both the back seat and the trunk. Detective Grimsley did not see Herbst put anything inside or take anything out of the vehicle. Herbst then got into the driver's seat and drove away. Detective Grimsley followed at a distance of approximately one block. It was still daylight at that time. Detective Grimsley testified he intended to stop Herbst's vehicle if justification arose to do so in order to further his drug investigation.

At the intersection of south Rustin and Peters, approximately six blocks from where they started (Exhibit G), Detective Grimsley saw[5] Herbst slow and roll through the stop sign at the corner. Detective Grimsley testified this is a stop sign violation because the law requires a driver to stop by halting the vehicle's momentum, which Herbst failed to do. Upon seeing this, Detective Grimsley radioed to request that a marked patrol unit conduct a traffic stop of the Toyota for the stop sign violation. Detective Grimsley described the vehicle, including the Colorado license plate number. SCPD Officer Julian Loera, who was on routine patrol that day, responded to the request. Within approximately one minute, Officer Loera located the Toyota parked in a business parking lot, activated his vehicle's police lights, and pulled in behind the vehicle. Detective Grimsley parked nearby and watched the encounter.

After Officer Loera pulled behind the Toyota, Herbst stepped out of the car and approached Officer Loera. Ex. 1 at 00:30. After being told several times to do so, Herbst followed Officer Loera's directions to get back into the car. Officer Loera spoke

---

[5] On Exhibit GG, Detective Grimsley placed one X near where he surveilled Herbst on Paxton Street, a second X for the location of Herbst's vehicle where he saw it run the stop sign, and a third X for where he was located at that time (approximately one block away).

with Herbst at the Toyota's driver's window and informed him he had failed to stop at a stop sign. He asked Herbst for his license, insurance, and registration, which he had to ask for several times before Herbst complied. Herbst denied driving the vehicle and said his girlfriend had been driving and was inside a nearby restaurant. He accused Officer Loera of putting him into the driver's seat. Detective Grimsley never lost sight of Herbst's Toyota while following him, and Herbst was always the sole occupant of the vehicle, which Officer Loera was aware of when he stopped Herbst. Officer Loera told Herbst that someone had seen him driving the vehicle. Around this time, Sergeant Hoogendyk arrived as backup for the traffic stop.

Both Officer Loera and Sergeant Hoogendyk described Herbst as acting very nervous. Officer Loera testified that Herbst acted differently than most motorists he had encountered during other traffic stops; he was nervous and shaking and remained argumentative the entire time. Herbst reached around his car more than motorists during other traffic stops, including on the floorboard, which Officer Loera thought was an abnormal place to look for his license, insurance, and registration. Herbst also kept reaching toward the area by his right knee or quadriceps, and Officer Loera told him several times to put his hands on the steering wheel. Sergeant Hoogendyk reported that Herbst was shaking, which was visible in both his arms and legs. Ex. C at 12. Sergeant Hoogendyk also described Herbst as "worked up" and "very stressed out." *Id*. He later said Herbst "was so nervous" during the initial encounter. Ex. 1 at 15:34. While standing beside the passenger window, Sergeant Hoogendyk saw Herbst make a telephone call to his girlfriend to ask her to come to the scene. Ex. 1 at 1:14.

Officer Loera had requested that dispatch run Herbst's license and registration, but because the response was taking time, Officer Loera returned to his vehicle to run the checks himself to move things along. Ex. 1 at 3:45, 4:29. These checks showed that Herbst did not have a valid driver's license. *See* Ex. A at 9:07. Officer Loera also requested a narcotics K-9 officer come to the scene to conduct a search of the Toyota. *See* Ex. A at 8:53. Officer Loera was aware that Detective Grimsley worked for the

Special Investigations Unit and conducted drug investigations. He testified he requested a K-9 during the traffic stop based upon his observations of Herbst's nervous and odd behavior. Officer Jacob Noltze[6] and his K-9, Odin, arrived at the scene. He had heard Detective Grimsley's initial request for the traffic stop and believed that the stop was connected to a drug investigation based on Detective Grimsley working in the Special Investigations Unit. Officer Noltze testified that after hearing Detective Grimsley request the traffic stop, he went to a secure police channel and heard Detective Grimsley relay information about his investigation. Officer Noltze and Odin arrived at the scene while Officer Loera was in his patrol vehicle (likely running Herbst's information). At the request of Sergeant Hoogendyk, Officer Noltze told Herbst's girlfriend (who arrived around the same time) to stay back from Herbst's vehicle. Ex. 1 at 6:26.

Officer Loera returned to the Toyota and asked Herbst to step out of the car. Herbst complied, leaving the driver's door open. Exs. 1 at 7:03, A at 9:29. Officer Loera then told Herbst to turn and put his hands behind his back. Herbst said he was not going to do so and began physically resisting being handcuffed. He yelled at his girlfriend to get his camera[7] (which he had removed from the car and dropped to the ground while struggling with officers). Ex. A at 9:18. At this point, Detective Grimsley ran to the scene. Officer Noltze removed Odin (who is certified for both police service[8] and narcotics detection) from his patrol vehicle and held him by his harness to assist as needed

---

[6] Officer Noltze testified that he has been a SCPD officer for almost thirteen years. In addition to basic law enforcement training, he has completed training in traffic reconstruction, SWAT and Advanced SWAT, narcotics, and money laundering. He has also undergone training to serve as a K-9 handler.

[7] Herbst claimed that he had filmed the encounter and that the video would show that he did not do anything wrong. Sergeant Hoogendyk confirmed that it appeared the video was recording prior to Herbst stepping out of the vehicle at Officer Loera's direction. Ex. C at 12.

[8] Odin's police service work includes apprehension and patrol, which involves aggression toward and control of suspects, protection of law enforcement officers, and searches for and tracking of persons or items.

with subduing Herbst and protecting officers. Ex. 1 at 7:18. Herbst's girlfriend made a beeline toward the Toyota and reached into the front seat area. Sergeant Hoogendyk pulled her out of the vehicle, and Detective Grimsley placed her in handcuffs and placed her into a patrol vehicle. Later, while still at the scene, the girlfriend told Officer Loera that she had not been driving the Toyota and that she came to the scene only because Herbst had called her.

Officers were able to restrain and handcuff Herbst, who continued to yell and state he was going to sue the officers. Exs. 1 at 7:43, A at 10:30. During a pat down, Sergeant Hoogendyk found a .22 caliber, Derringer-style handgun in Herbst's right shorts pocket. Exs. 1 at 7:53, A at 10:40. The handgun was loaded with five rounds of ammunition. Sergeant Hoogendyk told the other officers that he had located a firearm. Officers also found $705 in United States currency on Herbst's person. During this interim, Officer Noltze stood by with Odin, who was barking and visibly agitated. Ex. A at 9:40, 10:17. Officer Noltze had attached Odin's leash but continued to hold him by his harness. Ex. 1 at 8:00. Odin, according to Officer Noltze, was "keyed up" and barked every time Herbst yelled. Herbst was placed into a patrol vehicle (Ex. 1 at 8:29) and yelled up until that time.

Officer Loera conveyed to the other officers that Herbst did not have a valid driver's license. Ex. 1 at 8:49. Sergeant Hoogendyk discussed finding the firearm in Herbst's right pocket, and Officer Loera said that was the area towards which Herbst kept reaching while inside the vehicle. Officer Noltze loosened his hold on Odin's leash and let him walk around Officer Noltze. Ex. 1 at 8:57. Officer Noltze testified he was allowing Odin time to pause before giving him the narcotics command to search the Toyota. Officer Noltze testified that during that time, Odin walked toward the Toyota and jumped into the open driver's door. Exs. 1 at 8:58, A at 11:26. According to Officer Noltze, Odin went to the Toyota on his own, not at Officer Noltze's direction, and that he was trained to not pull Odin back with the leash. Officer Noltze testified that Odin stuck his head between the front seats, where his head lined up with two bags in the back

seat. According to Officer Noltze, Odin alerted to the odor of narcotics. Officer Noltze identified the alert based on Odin's change in breathing, his scratching on one the bags (a tool bag), and his possible drooling. Odin did not give a final indication by sitting or lying down, which Officer Noltze attributed to him not having room to do so inside the vehicle and because it would have raised his nose away from the source of the odor in the bag.

Odin exited the vehicle, and Officer Noltze had Odin sniff the exterior of the vehicle. Exs. 1 at 9:11, A at 11:58. During the exterior sniff (and even once while in the front seat), Odin continued to look back toward the area of the patrol vehicle where Herbst was seated. Officer Noltze acknowledged that he had to redirect Odin a couple of times. After going around the exterior of the Toyota, Officer Noltze closed the front door and opened the rear driver-side door. Odin turned away, and Officer Noltze redirected him into the back seat to again sniff the Toyota's interior. Exs. 1 at 9:49-10:11, A at 12:19-12:40. Odin was inside the vehicle for approximately ten seconds before exiting. Exs. 1 at 10:21, A at 12:50. According to Officer Noltze, Odin did not alert or indicate to narcotics aside from the first time when he was in the front seat.

Officer Noltze then returned Odin to his patrol vehicle. Detective Grimsley testified that after the dog sniff, Officer Noltze informed him that Odin had alerted[9] to the odor of narcotics inside Herbst's vehicle. He reported that Officer Noltze specifically said Odin had alerted in the back seat of Herbst's vehicle. Ex. C at 9. They also

---

[9] Detective Grimsley, who often works with Officer Noltze, testified that he could not recall if Officer Noltze initially signaled to him verbally or non-verbally that Odin had alerted. He testified that sometimes Officer Noltze either shook his head yes or no to let Detective Grimsley know whether Odin had alerted during a narcotics sniff. Detective Grimsley testified that although he could not specifically recall how Officer Noltze first conveyed to him that Odin had alerted, he had a conversation while still at the scene in which Officer Noltze told him Odin had alerted to narcotics in the back seat. After the exterior sniff, the video shows Officer Noltze talking to Detective Grimsley and pointing back toward the Toyota. Ex. 1 at 10:25. The audio does not reflect what they are saying, but shortly thereafter, Officer Noltze said that Odin "kept going to the middle." Exs. 1 at 10:59, A at 13:25. The video also shows them talking later, although once again there is no audio of what they are saying. Ex. 1 at 25:00.

discussed the firearm and money they had discovered on Herbst's person. Ex. 1 at 10:51. Officer Noltze and Detective Grimsley then began searching the Toyota. Ex. 1 at 11:04. In the backseat area, Officer Noltze found, among other items, a red bag located on the rear passenger floorboard, which contained syringes, a straw, a baggie with crystal residue inside, and a small First Alert brand safe. Ex. 1 at 13:02. On the front seat, officers found .22-caliber ammunition (which matched the firearm found in Herbst's pocket), a cell phone, and "medicinal" marijuana from Colorado. Ex. 1 at 17:19, 17:55. In the trunk, officers located additional syringes and drug paraphernalia (including containers that once held marijuana products from Colorado). Officer Noltze relayed to Detective Grimsley that they had located the safe, several needles, ammunition, and marijuana. Ex. 1 at 19:13, 25:36; Ex. A at 21:10.

After the vehicle search, Detective Grimsley took custody of the items seized. He questioned Herbst about what was inside the safe. Herbst admitted post-*Miranda* to being a methamphetamine user and said the safe contained additional cash but not drugs. Officer Noltze testified that the other officers were trying to decide what to do with the Toyota, specifically whether to have it towed, as there was an issue with the driver's window not rolling up. Ex. 1 at 26:19, 27:44, 31:00; Ex. A at 29:50. Ultimately, officers released the Toyota to a third party[10] rather than having it towed. Ex. 1 at 37:46.

Detective Grimsley testified that based on his training and experience, it is common for drug dealers to carry (1) firearms for protection and/or intimidation; (2) extra ammunition for those firearms; (3) large amounts of United States currency collected from drug sales and used to purchase additional quantities of drugs; and (4) cell phones, which are used to communicate with others regarding drug sales and meetings.

---

[10] In speaking with that third party, Sergeant Hoogendyk said he believed Herbst would be charged with a firearms offense and asked if Herbst had a permit for the handgun they had found. This is the only indication that officers inquired whether Herbst lawfully possessed the firearm, aside from a comment that they would need to "look [Herbst] up and see what his history is" (Exhibit 1 at 17:19). The sergeant also said Herbst would likely be charged with resisting arrest and not having a valid driver's license, and his girlfriend would be charged with interference.

Detective Grimsley has also learned that drug dealers often store drug-related information and photographs on their cell phones and other media, such as thumb drives.

Detective Grimsley testified he believed that the $705 in United States currency seized from Herbst and the additional cash Herbst said was inside the safe came from the sale of drugs. He further believed the safe would contain drugs, including methamphetamine. Based on the CI's information and what officers discovered during Herbst's stop (in particular finding the safe and a baggie with suspected drug residue), Detective Grimsley went to the police department to write an application for a warrant to search the safe, cell phone, and thumb drives. Officer Noltze also went to the police department, where he had Odin conduct a free sniff (moving about on his own rather than on a leash with Officer Noltze) of a room where Herbst's safe had been placed on a counter. Officer Noltze testified the second sniff was performed to determine whether the safe (and not another item from the Toyota) contained the odor of narcotics. According to Officer Noltze, Odin provided an indication that the safe contained narcotics, and he conveyed this information to Detective Grimsley.

Detective Grimsley completed an application and affidavit for a warrant to search the safe, cell phone, and thumb drives seized from the Toyota. Ex. D at 3-9. A state magistrate judge signed the requested search warrant. Ex. D at 1-2. Officers found approximately twenty grams of methamphetamine and $18,000 in United States currency, separated into $1,000 increments, inside the safe. Officers did not find anything of evidentiary value on the thumb drives (one of which they could not open) but located information they believed was related to drug sales on the cell phone.

## II.   DISCUSSION

### A. The Initial Traffic Stop

"[I]t is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (alteration in original) (quoting *United States v. Barry*, 98 F.3d 373, 376 (8th

Cir. 1996)).  Iowa law requires vehicles to stop at intersections with stop signs.  Iowa Code § 321.322.  There is no dispute[11] that the Toyota was required to stop at the intersection in question.  *See* Ex. 3A.  Herbst agrees that if the court finds that Detective Grimsley saw him fail to stop at the stop sign, then probable cause supports the stop.  He argues, however, that Detective Grimsley's testimony should not be credited because it is not corroborated by another witness or video recording and further because of Detective Grimsley's motivation to stop the vehicle.  Herbst implies that Detective Grimsley's underlying motivation to stop the vehicle (to further his drug investigation) affected what he saw that day and calls into question his testimony that he observed a traffic violation.

Detective Grimsley testified that when he followed the Toyota away from the residence, he intended to have it stopped if justification arose to do so.  When probable cause supports a traffic stop, the stop is objectively reasonable and an officer's ulterior motive is not relevant.  *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016).  "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  *Id.* (quoting *Wren v. United States*, 517 U.S. 806, 813 (1996)).  This is true even if the officer would have ignored the traffic violation but for the underlying motive to stop the vehicle.  *Id.*

Detective Grimsley testified that he saw the Toyota roll through the stop sign at Rustin and Paxton, rather than coming to a complete stop as required by the law.  He made this observation during daylight hours and from a distance of no more than one block.  There is no indication that Detective Grimsley's view of the Toyota at that

---

[11] The only dispute at the time of the traffic stop was whether Herbst was driving.  He claimed throughout the encounter that his girlfriend was driving the vehicle.  *See* Ex. 1 at 1:41, 3:18, 3:34, 4:29, 6:50.  I credit Detective Grimsley's testimony that he saw Herbst drive away from the residence on Paxton, that the detective never lost sight of the vehicle, and that Herbst remained the sole occupant and driver of the vehicle.  This is corroborated by Officer Loera's testimony and the denial by Herbst's girlfriend that she drove the vehicle that day (Ex. 1 at 18:30).  Moreover, in terms of whether probable cause existed to stop the vehicle, it does not matter who was driving the vehicle at the time.

intersection was obscured. Nothing in this record suggests that Detective Grimsley has credibility issues or that he has provided false information in the past. Both Officer Loera and Officer Noltze each testified about hearing Detective Grimsley request a traffic stop contemporaneous to when he reported seeing the stop sign violation, which provides some corroboration for his testimony. Further, I find Detective Grimsley's testimony to be credible based on my observations during the suppression hearing. Although, ideally, the traffic violation would have been captured on video or observed by a second witness, the law makes no such requirement. *See United States v. Mendoza*, 677 F.3d 822, 828 (8th Cir. 2012) (finding the credible testimony of one officer regarding apparent traffic violation sufficient to establish probable cause to conduct a traffic stop). Thus, I find probable cause existed to stop the Toyota for a traffic violation, and the stop was objectively reasonable and not in violation of the Fourth Amendment. *See Fuehrer*, 844 F.3d at 772.

### B. The Search of the Safe

Probable cause for a search exists when, under the totality of circumstances, the available facts would warrant a reasonable and prudent person to believe that evidence of a crime or contraband will be present. *Florida v. Harris*, 568 U.S. 237, 243-44 (2013). Herbst argues officers lacked probable cause to search the safe they found in the backseat of the Toyota. He argues, primarily, that Odin's first sniff inside the vehicle was not reliable. A positive alert by a reliable narcotics dog may establish probable cause to search a vehicle. *United States v. Jackson*, 811 F.3d 1049, 1053 (8th Cir. 2016). "'[A] court can presume (subject to any conflicting evidence offered) that [a] dog's alert provides probable cause to search' if 'a bona fide organization has certified a dog after testing his reliability in a controlled setting . . . [or] if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.'" *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015) (quoting *Harris*, 586 U.S. at 246-47). A defendant can overcome this presumption by showing through

expert testimony, other evidence, or cross examination that the training or certification was inadequate or that the circumstances surrounding a particular alert undermined a finding of probable cause. *Id.*

A hearing to determine whether a dog's alert provided probable cause proceeds in the same manner as any other probable-cause hearing; the court considers the competing evidence. *Harris*, 568 U.S. at 247-48. "The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248. In determining a drug dog's reliability, the court can consider the dog's training and certification, proficiency in locating narcotics (with "controlled testing environments" providing the "better measure" of reliability as compared to field data, which can still support a finding of reliability), and the particular circumstances surrounding the alert in question. *Id.* at 244-48.

Herbst argues that Odin's training records (Exhibit E) establish that he was not reliable on August 12, 2017. Herbst also argues that the particular circumstances surrounding the incident in question further demonstrate the sniff inside the vehicle was not reliable. Herbst further argues that Odin did not actually provide an alert inside the Toyota because it cannot be seen or heard on the video recordings, Odin was not interested in the backseat of the Toyota after purportedly alerting, and Officer Noltze's testimony cannot be credited.

Herbst also seems to argue that the search warrant should be suppressed pursuant to *Franks v. Delaware*[12] based on a material omission in Detective Grimsley's affidavit. Herbst does not make this direct argument in his briefing (Doc. 28-1 at 11-13). Rather, he likens this case to *United States v. Jacobs,*[13] in which the court suppressed a search

---

[12] 438 U.S. 154 (1978).

[13] 986 F.2d 1231 (8th Cir. 1993).

warrant because the officer stated the K-9 showed "interest" in the suspect package but recklessly omitted the fact that the K-9 failed to alert on the package and the handler was not certain whether the K-9 gave an alert, and further that this omission made the affidavit misleading. Toward the end of his argument at the suppression hearing, Herbst's attorney mentioned *Franks v. Delaware* in arguing that Detective Grimsley's affidavit omitted Odin's failure to give a final indication (stating only that Odin alerted) and that this omission was made recklessly and resulted in a misleading affidavit. I believe Herbst may have waived this argument by failing to properly raise it in his motion, but I will err on the side of caution and address the issue as part of this report and recommendation for the district judge's ultimate determination.

### i.    *Odin's Certification and Training*

Officer Noltze has been partnered with Odin since August 2013, and they were first certified for narcotics and police service in November 2013. Odin has been certified annually since that time. Officer Noltze and Michael Morgan,[14] a master trainer with Dogs for Law Enforcement (DLE) who provides annual certification testing for the SCPD, testified about the certification process.[15] For narcotics certification, a K-9 must complete odor recognition testing (being able to identify drug odors) and "real world" testing (sniffing and locating drugs hidden in locations such as boxes, buildings, and vehicles). Certification is pass fail and provides minimum standards; it ensures that the dog can identify narcotics odors and provide an alert and that the handler is able to

---

[14] In addition to his work with DLE, Morgan owns Mid-Michigan Kennels, where he provides training for K-9 handlers and K-9 dogs. He testified about his extensive experience of creating and leading national and international K-9 training programs for both narcotics and explosives detection. He also provided his education and experience, which includes eleven years as a K-9 handler, in addition to his current work as a trainer and certifier. Morgan provides testing for hundreds of renewal certifications each year, including the SCPD. Morgan also testified about the process he uses to train K-9s in narcotics detection, which was similar to the methods Officer Noltze testified were used with Odin.

[15] Exhibit 2B also outlines DLE's certification procedures.

identify the dog's alert.  For the past two years, Morgan has certified for both police service and narcotics (Odin is certified to detect the odors of marijuana, methamphetamine, heroin, cocaine, and ecstasy).

Officer Noltze and Odin undergo four hours of training each week with the SCPD's four to five other K-9 dogs and handling officers.  During that training, the officers discuss any calls they conducted over the prior week.  They tailor the training session based on those discussions to address any issues the K-9s may have experienced.  The dogs and handlers then complete physical training, which includes locating hidden narcotics, building searches, obedience, apprehension and patrol work, or any combination thereof.  Each week's training varies.  Officer Noltze completes a training log for Odin (Exhibit 2A) after each training session.  The training log lists the type of training Odin completed and how he performed during that training.

Odin has performed over one thousand narcotic sniffs in total, and he conducts approximately ten to fifteen sniffs per month.  Officer Noltze testified that Odin has improved in his ability to indicate and that he considers Odin reliable in locating narcotics.  Morgan also opined that Odin is reliable in narcotics detection based on his review of Odin's certification and training records (Exhibits 2 and 2A), from watching the video of Odin's sniff of Herbst's Toyota, and from listening to Officer Noltze's testimony during the suppression hearing.

Herbst does not challenge the methods and qualifications of either Morgan or DLE in certifying Odin.  I find that the testimony of Officer Noltze and Morgan, in addition to Odin's training and certification records, demonstrate that Odin was trained and certified to detect narcotic odors on August 12, 2017.  This factor weighs in favor of finding reliable his alert from August 12, 2017.

### ii.    *Odin's Proficiency*

Officer Noltze testified that Odin "alerts" when he detects the odor of narcotics.  Officer Noltze recognizes when Odin alerts because there is a change in his natural

responses: his breathing changes; he tries to narrow the source of the odor (called "bracketing");[16] and he may drool, paw, or scratch where he is sniffing. After he has alerted to the odor of narcotics, Odin is trained to provide a final "indication" once he has found the source of the narcotic odor. Odin indicates passively by sitting or lying down. Officer Noltze testified that there are times when Odin will not provide a final indication after he alerts to the odor of narcotics. According to Officer Noltze, factors that may affect whether Odin indicates include the temperature (he will not want to sit if the ground is cold), an elevated source (if the odor source is above his head, he may "bracket" the area or jump or stand on the wall or object to try and reach the source of the odor), and the area where he is located (he cannot sit in confined spaces or when his footing is uneven). Odin's ability to locate an odor's source can also affect his ability to provide a final indication, including the size of the area (he may be able to narrow the source of a scent more quickly in a smaller area) and climate conditions (such as wind or air flow).[17]

Odin's training records list issues he has experienced with narcotics detection. Some records, including from August 2017, reflect that Odin needs improvement in narcotics work. Exs. E1–E-3, E-5–E-8, E-11, E-15–E-17. A portion of those records show that Odin was able to alert but was slow or not able to provide a final indication. Exs. E-2 at 2, E-8 at 2, E-11, E-13 at 2, E-14 at 2, E-17 at 2. On two of these occasions,

---

[16] Officer Noltze testified that Odin "brackets" by sniffing from left to right in a cone pattern to try and narrow the location of the odor's source. When he is farther away from the source, Odin will have a larger bracket, which will narrow as he gets closer to the source of the odor. Morgan also gave a similar description of how K-9s "bracket" to locate the source of an odor. Morgan further explained there are two types of odor—direct source (like holding a marker in front of your nose) and perimeter or cone odor (a judge smelling a marker that a witness is holding on the witness stand). When a K-9 detects the second type of odor, it will smell back and forth, almost like ping pong, to narrow down the scent and locate its source.

[17] Both Morgan and defense expert Jim Pauley provided testimony consistent with Officer Noltze that air flow may affect a K-9's ability to detect odor. Morgan also testified that the size of an area can affect a K-9's ability as well.

Odin had some difficulty sniffing certain types of areas, including a vehicle ("passenger van was hard for dog to detail") and drugs hidden up high ("high finds were a challenge[;] dog would alert to odor but slow to pin point source").  Exs. E-4 at 2, E-8 at 2.  The remainder of the records cited by Herbst (not including the complete training records submitted by the Government in Exhibit 2A) demonstrate that Odin "meets standards" for narcotics work and did not need improvement.  Exs. E-4, E-10, E-12, E-13, E-14.

Those records are consistent with Officer Noltze's that Odin has experienced some problems providing a final indication after he detected the odor of narcotics.  Officer Noltze explained that Odin has not struggled with alerting to the odor of narcotics and that he does so consistently; rather, he has difficulties with providing a final indication that he has pinpointed the source of that odor.  Officer Noltze said this has occurred in three scenarios: (1) when the narcotics are located up high and Odin cannot reach the source; (2) in a room where the odor may have traveled up and across the ceiling (known as the "chimney effect"), and Odin alerted on the opposite side of the room from where the narcotics were hidden; and (3) in locations where Odin did not have room to sit (such as inside or underneath vehicles).  In the third scenario, Odin has buried his head (under a car seat for instance) or tried to crawl under the vehicle, which Officer Noltze believed were attempts to reach the source of the odor.  I believe Officer Noltze's testimony helped explain the portions of the training records that state Odin needs improvement in indicating.  Based on the overall training records (Exhibit 2A) and Officer Noltze's testimony, I find that Odin's occasional failure to provide a final indication does not make him unreliable in general.

Although Officer Noltze testified that Odin generally has no issues with alerting to the odor of narcotics, the training records show otherwise.  Some of the records show that Odin has failed at times to provide any alert or indicate on hidden narcotics, including methamphetamine.  Exs. E-5 at 2, E-7 at 2, E-10 at 2, E-16 at 2, E-17 at 2.  These difficulties and misses on Odin's part demonstrate it is possible that he may not alert or

indicate even when narcotics are present. I do not find that this detracts from the reliability of the sniff he conducted in this case.

Odin's false alerts, on the other hand, are concerning. Training records indicate that Odin has shown interest or alerted on items where narcotics were not present. Exs. 2A at 238, E-6 at 2, E-9, E-12 at 2. In March 2015, Odin "indicated on flavored tobacco" in a room where no narcotics had been hidden. Ex. E-12 at 2. On September 2, 2015, Odin gave an "indication on plastic (prey)" in a room that did not contain narcotics ("1st room blank"). Ex. 2A at 238. This appears to be a false positive. The next day, Odin provided a "false indication on butane heater unknowingly correlated." Ex. E-9. It is unclear whether there were narcotics located in the same room or near the location of the butane heater. *See id*. During an October 2016 incident, Odin "showed interest in coffee for unknown reason" during a search of "proofs." Ex. E-6 at 2. It is unclear what a "proofs" search involves, but it does not appear that narcotics were hidden as part of that search. *See id.*

Officer Noltze testified there have been times when Odin alerted to the odor of narcotics, but no narcotics were located. In these situations, Officer Noltze has asked questions related to drug use to try and explain Odin's alert. Officer Noltze believes that these alerts occurred because of "residual odor"[18] from non-drug items that contained the lingering odor of narcotics. Examples, based on Officer Noltze's experience, include clothing the person wore while using drugs at a different location or when someone had used drugs in the vehicle the day before. Although Officer Noltze's testimony provides a plausible explanation for times when Odin alerted while in the field, it does not directly address why he alerted during training. It is possible, based on the testimony regarding

---

[18] Morgan also testified about "residual odor," where a narcotics odor may linger in an area after the narcotics are removed. The Supreme Court has recognized this phenomenon. *See Harris*, 568 U.S. at 245-46. Morgan testified that because of residual odor, he is careful to place a barrier (such as a board) between the item containing drug odor and the surface on which it is hidden. It is not clear if the SCPD officers uses similar precautions during their weekly training.

residual odors, that these alerts occurred at locations where trainers had previously hidden narcotics. The false alerts during training, however, are concerning and weigh against finding Odin reliable. In considering this evidence, however, the number (four out of thousands of sniffs) and timing (most recently in October 2016, nearly a year prior to the sniff in question) of the false alerts mitigate this concern.

A review of Odin's most recent training records, from January 2017 through October 16, 2017 (Exhibit 2A at 367-403), support a finding of reliability. In March 2017, Odin sniffed eight vehicles that contained no drugs and did not alert on any of them. Ex. 2A at 371. On August 14, 2017, two days after the sniff in this case, Odin provided an alert but no final indication to hidden ecstasy and had difficulty locating crack cocaine, which he eventually located. Ex. 2A at 395. During that training, Officer Noltze noted Odin's search of seven vehicles (one or two of which held hidden methamphetamine and cocaine) "were solid." *Id.* Overall, these records, which were closest in time to the events in question, demonstrate Odin's reliability in locating narcotics.

There is no question that Odin has had issues with detecting narcotics. The relevant inquiry, however, requires consideration of his overall record to determine whether his narcotics-detection skills are trustworthy. Weighing all the evidence, I do not find that the training records support the conclusion that Odin is unreliable.

### iii.     *Circumstances of this Particular Sniff*

Herbst also argues the circumstances surrounding Odin's sniff of Herbst's vehicle further demonstrates his lack of reliability. In particular, he argues Odin was hot, excited from Herbst's arrest, and not focused on the narcotics sniff. He also argues that Odin did not alert because the alert cannot be seen on the video and Officer Noltze's testimony should not be believed based on the language he used. The circumstances surrounding a particular sniff may render that search unreliable. *See United States v. Heald*, 165 F. Supp. 3d 765, 771-72, 778-79 (W.D. Ark. 2016) (finding a sniff unreliable when, among

other factors, the K-9 was distracted and affected by heat, and "law enforcement's actions during and after the open-air drug sniff illustrate[d] the uncertainty of whether [the K-9] alerted at all, and if he did, whether the alert was reliable").

The events in question happened outside on a warm, August day. Odin was panting according to both Officer Noltze and the video. Ex. 1 at 8:00-8:57. Officer Noltze testified that he did not believe this affected Odin's ability to detect narcotics that day. By way of contrast, the training records show that on July 11, 2017, one month prior to the Herbst encounter, Odin "was struggling due to heat," but after wrapping him in cold towels and giving him ice water, Odin "recovered quickly." Ex. 2A at 389. There is no indication that Odin required such measures here. Herbst offered the opinion testimony of Jim Pauley[19] that Odin's panting meant he was not able to sniff properly because he was breathing to take in air rather than scent. Both Morgan and Pauley testified that narcotics K-9s are often excited to do the work they are trained for, which would imply they might breath heavily when performing this work. In light of each of these considerations, I do not find that the heat or Odin's panting made his narcotics work unreliable on August 12, 2017.

Herbst also argues that Odin did not have sufficient time to transition from apprehension mode to narcotics detection and that his distraction during the narcotics sniff rendered any alert unreliable. There is no dispute that Odin was agitated during the apprehension phase when officers were arresting Herbst, that he transitioned quickly from

---

[19] Pauley has over thirty years of prior experience as a K-9 handler (first in the military beginning in 1975 and then with the police department in Rock Island, Illinois, serving nearly twenty of those years as the department's K-9 trainer). Although he trained both passive and aggressive alert dogs, it appears he is most familiar with aggressive-alert dogs (who give a final indication by biting or scratching rather than sitting or lying down). Pauley reviewed the videos (Exs. 1, A), and a subset of Odin's training records (most likely Exhibit E, although this is not clear from the record) prior to the suppression hearing. He also listened to Officer Noltze's testimony prior to testifying.

apprehension mode to narcotics detection, and that he appeared to be distracted while searching the Toyota.

In Pauley's opinion, Officer Noltze did not provide an adequate break between the apprehension phase and the narcotics-detection phase. If faced with the same situation, Pauley would have allowed Odin a longer break of five to ten minutes, closed the driver's door to allow the odor to settle, and first conducted an exterior sniff of a different vehicle to make sure Odin had calmed down. Pauley believes that Odin was still in apprehension mode, and not narcotics-detection mode, as evidenced by his looking back toward the patrol vehicles while in the front seat of Herbst's vehicle. *See* Ex. 1 at 9:03-9:11.

Pauley also pointed to Odin not wanting to enter the back seat of the Toyota after the exterior sniff. He found that significant because in his training and experience, if a K-9 smelled the odor of narcotics once, it will want to return to that location to find the narcotics so it can get its reward. He reiterated that the video does not show Odin alert, and in his opinion, he could not tell if Odin was searching or just looking around. Both Pauley and Morgan testified that narcotics dogs become excited and do whatever is possible to give a final indication that they located the source of drugs because they know from training that when they indicate, they will receive a reward. These observations and opinions cast doubt on Odin's sniff of Herbst's vehicle.

Based on Officer Noltze's testimony, Odin's excitement was consistent with his patrol training, where he learned to engage and apprehend a suspect and also to protect his handler and other officers. Officer Noltze testified he generally allows Odin approximately five minutes to calm down before transitioning from apprehension mode to narcotics-detection mode, during which time he does not leave the area. On this day, there were approximately thirty seconds between when Herbst was arrested and placed into a patrol vehicle and when Odin jumped[20] into the Toyota. Ex. 1 at 8:29-8:58. Officer

---

[20] Officer Noltze testified that Odin jumped into the Toyota on his own accord. Although I credit Officer Noltze's testimony, the video (Exhibit 1 at 8:57) does not clearly show that Odin entered

Noltze believes, however, that Odin noticeably calmed down when Herbst and his girlfriend were placed into patrol vehicles. He described Odin's energy level as "middle of the road," and this disposition allows Odin to calm more quickly than higher-energy dogs. Officer Noltze's testimony appears to be consistent with the video evidence. *Compare* Ex. 1 at 7:18, 8:21 (Odin tense and barking), *with* Ex. 1 at 8:00, 8:29 (Odin less tense), *and* Ex. 1 at 8:57 (Odin calmer and walking around Officer Noltze). Morgan also opined that, based on the video, Officer Noltze did a good job of settling Odin and then conducting the narcotics sniff. Officer Noltze did not state whether he thought the short duration of the transition period[21] or Odin's distraction affected his narcotics-detection ability, but he did testify he believed Odin was reliable.

Officer Noltze testified that he believed air flow in the Toyota would have "absolutely" affected odors in the vehicle. Both Morgan and Pauley agreed that this type of factor can affect a dog's ability to detect odor. This could perhaps explain why Odin alerted while in the front seat but failed to do so on the exterior or in the back seat of the Toyota. One of Odin's training records, from February 2014, shows that he was distracted during training, and he had "to be redirected to sniff vehicles." Ex. E-15 at 2. This resulted in Odin missing narcotics during the first pass around the vehicle, but he thereafter found the hidden drugs. *Id.* This factor demonstrates that Odin being distracted may have made his narcotics search less reliable, but that lack of reliability would make it more likely he would miss (rather than provide a false-positive alert for) the odor of narcotics. This factor also could possibly explain why Odin provided no alert or indication while searching the exterior of the Toyota.

---

the Toyota on his own. Herbst does not raise Odin's entry into the Toyota as a basis for suppression, so I will not address the issue.

[21] Although not directly addressed by the parties, I note that Odin was only inside the Toyota for approximately thirteen seconds during the first sniff of the interior. Ex. 1 at 8:58-9:11. This factor may further call into question the opportunity Odin had to alert to the odor of narcotics, although this is not clear based on this record.

Herbst further argues that Odin providing an alert and not a final indication means the court cannot find probable cause existed to search the safe. He believes that this factor and the terminology used by Officer Noltze demonstrate that Odin merely showed interest and did not alert or indicate while inside the vehicle. Herbst's argument rests on the finding in *Jacobs* that, in part, a mere interest (as compared to a trained alert) cannot support a finding of probable cause. *See Jacobs*, 986 F.2d at 1234-35.

Morgan provided testimony consistent with that of Officer Noltze (discussed in the preceding section) about when narcotics dogs alert versus indicate. Morgan testified that for an "alert," the dog's behavior changes and its sniffing becomes more intense. He believes this is based on a dog's training, where it learned it will receive a reward if it find narcotics. According to Morgan, dogs alert in different ways because they are individuals, just like humans. A handler is trained to recognize his dog's alert. Morgan testified a K-9 "indication" comes after an alert and may be shown by the dog sitting.

Morgan testified during cross examination that a narcotics dog who pushed a package around and scratched at it twice (that fact pattern outlined in *Jacobs*, except with the dog scratching rather than sniffing) would have provided an alert. He elaborated that a K-9 may show "interest" in an item but not provide a narcotics alert or indication. Morgan provided an example of a K-9 sniffing lockers at a school. The K-9 may stop to check the locker of a student who owns a cat, but that would be different than the behavioral changes associated with a narcotics alert. An alert, according to Morgan, involves a change in the K-9's behavior that occurs only with the odor of narcotics. In his experience, handlers usually give their K-9s a reward during an alert or indication, although it may depend on the situation.

In Pauley's experience, an "alert" and "indication" have the exact opposite meanings as compared to the testimony of Officer Noltze and Morgan. To him, an alert is the final step and involves a definite change in behavior where the K-9 bites or scratches at the odor source (if an aggressive-alert K-9) or sits (if a passive-alert K-9) (what Officer Noltze and Morgan described as an indication). An indication, in Pauley's experience,

is a lower-level response (what Officer Noltze and Morgan described as an alert). In Pauley's training and experience, a dog that detects narcotics will do everything possible to give a final alert (or indication, according to Officer Noltze's and Morgan's terminology), which in this case would have been to sit. This is because, in Pauley's experience, narcotics dogs learn they receive their reward only when they provide their final, trained response. Morgan provided similar testimony about a narcotics dog wanting to do what is needed to receive its reward.

I understand Herbst's concern with the terminology used in this case. Although words can matter, I do not believe that the use of the term "alert" versus "indicate" affects Odin's reliability in this case. Either term refers to a specific, trained response for Odin. I, likewise, do not believe the facts of this case are analogous to *Jacobs*, in which the narcotics dog "had not given its trained response when confronted with a package containing drugs, coupled with the dog handler's admission that he could not say with certainty that drugs were in the package." *Jacobs*, 986 F.3d at 1235. In this case, Officer Noltze provided unequivocal testimony that Odin alerted but did not give a final indication while inside the vehicle, and he did not alert or indicate during the subsequent exterior and interior vehicle sniffs. Morgan believed that Odin alerted based on Officer Noltze's description that Odin moved toward the area, pawed at the location, and most significantly, possibly drooled. According to Morgan, that drooling (which demonstrates anticipation) provides clear evidence of an alert because it is an uncontrolled response that cannot be provoked by the handler, nor faked by the K-9. He likened this drooling to a Pavlovian response and explained it is developed during narcotics training where the K-9 learns that it will receive its reward if it finds narcotics.

I have concerns about Odin's alert, based primarily on the short duration he was inside the Toyota, his apparent distraction during that search, and his disinterest in continuing to search the vehicle. These factors call into serious question the reliability of his reported alert. I believe the testimony from Morgan and Officer Noltze, in addition to Odin's training records, demonstrate that Odin did not provide a final indication

because of the small space inside the vehicle, and because (as Officer Noltze testified) doing so would have moved his nose farther away from the odor. The final issue, therefore, lies in whether to credit Officer Noltze's testimony that Odin alerted while in the front seat. I have considered each of the issues discussed above, in addition to my observations of Officer Noltze while he testified. As with Detective Grimsley, there is no indication that Officer Noltze has provided false information in the past or has other credibility issues. His testimony was unwavering, and he candidly acknowledged Odin's flaws. For these reasons, I credit his testimony about Odin's alert while inside the Toyota. I believe this finding is further supported by additional evidence. After he finished the vehicle search with Odin, Officer Noltze spoke with Detective Grimsley and immediately began searching the vehicle. Detective Grimsley testified that he understood Odin had alerted for narcotics in the back seat of the Toyota. *See* note 9, *supra*. Both he and Sergeant Hoogendyk assisted Officer Noltze in searching the Toyota. There is no indication that Officer Noltze was hesitant or uncertain whether Odin had alerted inside the Toyota. Ultimately, although I question some of the circumstances surrounding Odin's search at the scene, I believe the overall testimony explains Odin's actions and provides an understanding for the significance of what occurred during that sniff.

Finally, Herbst also points to the fact that you cannot see Odin alerting from the video. He further argues that Officer Noltze does not appear to praise Odin for providing a positive alert. Herbst appears to assert through these arguments that Officer Noltze's testimony cannot be believed. Similar to the traffic stop, a narcotics dog's alert need not be captured on camera to have occurred. The evidence is not clear whether Officer Noltze praised Odin for his purported alert inside the Toyota. Both Morgan and Pauley testified they did not see that Officer Noltze rewarded Odin for providing an alert. Although the video likewise does not show Officer Noltze giving Odin physical affection or a toy reward, Officer Noltze and Odin are off camera when he returns Odin to his patrol vehicle after the search. It is possible that Officer Noltze rewarded Odin at that point, although there is no testimony to support such a conclusion. The audio from the

video is also not definitive; although it does not clearly show Officer Noltze verbally praising Odin, it appears that he may have said "good boy" when Odin exited the Toyota's front seat. *See* Ex. 1 at 9:11. It could be possible that Odin did not receive praise because he only provided an alert and not a final indication, he had not completed the vehicle search after exiting the front seat, and/or he was distracted and did not alert or indicate after the additional search. Because the record on this issue is not clear, I decline to weigh this factor in my analysis.

Each of the issues discussed above raise concerns about the narcotics search of the Toyota[22] conducted by Odin on August 12, 2017. Based on the totality of the circumstances, however, I believe this records supports a finding that Odin was reliable and that Officer Noltze's testimony should be credited. Accordingly, I find that Odin provided a reliable, positive alert for the odor of narcotics during the first sniff of the Toyota being driven by Herbst.

### C. Omission of Failure to Indicate in Search Warrant Affidavit

To be entitled to a *Franks* hearing[23] for an affidavit omission, a defendant must make "a substantial preliminary showing that . . . the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made[] the affidavit misleading" and that if the missing facts had been included, the affidavit "would not have been sufficient to support a finding of probable cause." *Jacobs*, 986 F.2d at 1233-34 (quoting

---

[22] With regard to the second sniff (of the safe at the police department), Morgan testified he believed Officer Noltze allowing Odin to "free search" without direction was consistent with Odin's training records. Aside from challenging Odin's reliability, Herbst does not question this second sniff of the safe or that Odin provided an indication on the safe at that time. While this sniff supports a finding of probable cause, it would be suppressed if Odin's original search is deemed unreliable. I believe this second sniff, however, does factor into the good-faith analysis addressed below.

[23] Because Herbst raised additional issues in his motion to suppress (Doc. 28), a hearing was held to timely address the motion. Accordingly, I will not address whether Herbst made the required preliminary showing to warrant a *Franks* hearing.

*Franks*, 438 U.S. at 155-56; *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir. 1986)). To make this showing the defendant must "offer specific allegations along with affidavits or similarly reliable statements." *Gonzalez*, 781 F.3d at 430 (quoting *Jacobs*, 986 F.2d at 1233-34).

In arguing the search of the safe was improper, Herbst asserts that Detective Grimsley[24] acted with reckless disregard for the truth by stating that Odin alerted and omitting that Odin failed to provide a final indication. During argument at the suppression hearing, his attorney expressed concern over the use of the terms "alert" versus "indication." Herbst also argued at the hearing that the affidavit omission shows that any reliance on the warrant by Detective Grimsley was not objectively reasonable and therefore not in good faith.

There is no evidence that Detective Grimsley acted intentionally in excluding Odin's failure to indicate in the search warrant affidavit. Therefore, I will examine whether he made the omission with reckless disregard that the omission made the affidavit misleading. Reckless disregard can be inferred from the fact that information was omitted, but only when the defendant shows the omitted information "would be 'clearly critical to the finding of probable cause.'" *Id.* at 431 (referring to the holding in *Jacobs*, 986 F.2d at 1235).

Herbst again relies on *Jacobs*, in which the court found the affiant acted with reckless disregard because he knew the narcotics dog showed only an "interest" in the package to be searched and failed to provide a trained response (an alert), and the dog's handler was not certain whether the package would contain drugs. *Jacobs*, 986 F.2d at

---

[24] As a best practice, Detective Grimsley should have perhaps included in the affidavit that Odin had provided false positive alerts in the past and that he had not had such issues since October 2016. Herbst does not argue this as a basis for suppression, and even if he had, there is no indication that Detective Grimsley was aware of this information, and based on the lack of recency of the last false positive, I do not believe that Detective Grimsley acted with bad intent or reckless disregard by not including this information. Nor do I believe this information was material to the magistrate judge's probable-cause determination.

1234-35. It would have been prudent for Detective Grimsley to clarify that Odin had alerted but failed to provide a final indication while inside the vehicle. Nothing shows, however, that Detective Grimsley was aware of this distinction.[25] To the contrary, he testified he had never received K-9 training and had minimal familiarization with the precise technology used by K-9 handlers. For this reason, I do not find significance in Detective Grimsley's choice of words for the affidavit. The testimony was consistent between Officer Noltze and Detective Grimsley that Odin had provided a positive alert to the odor of narcotics inside the vehicle, consistent with his training, and which the officers believed provided probable cause to search the vehicle. Although Herbst urges the court to not credit this testimony, for the reasons discussed in the preceding section, I find Officer Noltze's testimony to be credible.

I believe this case is more similar to the facts in *United States v. Holleman*[26] than *Jacobs*. In that case, the Eighth Circuit noted that other courts "have held a trained drug dog's 'alert,' as opposed to the more conclusive 'indication,' is enough to establish probable cause" to search property. *Holleman*, 743 F.3d at 1156 (citing *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009); *United States v. Clayton*, 347 F. App'x 497, 502 (5th Cir. 2010)). The court determined that when a K-9 provided a clear alert to the odor of narcotics, but not a final indication, and his handler provided sufficient explanation for why the K-9 did not provide a final indication, probable cause supported the search. *Id.* at 1156-57.

In the present case, Odin showed more than mere interest in the vehicle. Based on this record and my findings set forth above, Odin provided an alert to the odor of

---

[25] Officer Noltze, on the other hand, was aware of the distinction between an alert and a final indication. I do not find he acted intentionally by failing to explain the difference to Detective Grimsley for purposes of writing the search warrant. Whether he acted with reckless disregard (which I am inclined to find he did not for the reasons discussed in the previous section), I do not believe the omitted information is fatal to a finding of probable cause. Accordingly, I cannot infer recklessness from this omission. *See Gonzalez*, 781 F.3d at 431.

[26] 743 F.3d 1152 (8th Cir. 2014).

narcotics, which was a trained response, and failed only to provide a final indication that he had found the source of that odor. The testimony of Officer Noltze and Morgan provide a credible explanation for why Odin may not have provided the final indication. This explanation is further supported by Odin's training records (that he has consistently alerted to the odor of narcotics but does not always provide a final indication). Accordingly, I do not find the omitted information was material to the finding of probable cause. Regardless, as explained in the next section, I further find that Detective Grimsley relied in good faith on the warrant in executing a search of the safe.

### D. Search of the Cell Phone and Electronic Devices and the Good Faith Exception

Probable cause to search requires a nexus between the items officers are searching for and the place or item to be searched. *See United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017). "Factors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *Id.* (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)).

Herbst challenges the search of the cell phone and thumb drives by arguing that Detective Grimsley's affidavit fails to establish probable cause to search those items. The affidavit recounted the CI's information, Detective Grimsley's surveillance, and the traffic stop. It stated that officers found $705 in United States currency and the .22-caliber handgun for which Herbst did not provide a permit to carry. With regard to Odin's search, the affidavit included the following: "K-9 Officer Jake Noltze and his K-9 Odin conducted a sniff of the vehicle. Odin alerted to the presence of narcotics in the back seat." Ex. D at 4. The affidavit then listed the items found after Odin's alert: syringes, a baggie with white residue that field-tested positive for methamphetamine, a safe or lockbox (located under the container in which they found the syringes and methamphetamine residue), .22-caliber ammunition, the cell phone, and two thumb drives. Detective Grimsley included Herbst's statements of being a methamphetamine

user and that the safe would contain additional money. Finally, the affidavit stated, "K-9 Odin alerted to the odor of narcotics on the safe again" back at the police department. *Id.* While this information provides probable cause to search the safe, it does not address the cell phone and thumb drives, aside from saying they were seized from the vehicle.

As a preliminary matter, it is not clear what items the search warrant authorizes officers to search for. On the first page of the warrant application, Detective Grimsley checked boxes, among others, indicating that the property to be searched "has been obtained in violation of the law" and "the possession of which is illegal." Ex. D at 3. Another checked box states the property was used or intended to be used "as the means of committing a public offense." Ex. D at 3. Aside from the information in the affidavit, the application contains no mention of which public offenses were being committed through the use of the property to be searched. Nor does the search warrant itself specify such offenses—it states only the property "has been used in committing violations of the laws of this state." Ex. D at 2. In the affidavit, Detective Grimsley stated the "[i]tems to be searched for have been previously mentioned in [the] search warrant application." Ex. D at 4. There is no other indication, in either the application or the search warrant itself, which particular items officers would be searching for inside the safe or on the cell phone or thumb drives.[27] Because of the failure to include which laws were violated, what particular items are being searched for, or even belief statements by Detective Grimsley that probable cause existed to search the property for certain types of evidence, it is unclear from the faces of the search warrant and application (without making inferences from the supporting affidavit) whether the warrant authorized a search for drugs, firearms, child pornography, evidence of financial fraud, or other items and information.

---

[27] This raises a concern that the search warrant is overly broad, but I will not address this issue because Herbst did not raise it as part of his motion to suppress.

More specifically, Detective Grimsley failed to include information to show why the cell phone and thumb drive would likely contain evidence of a particular crime. This despite his testimony that based on his training and experience, drug traffickers often use cell phones and store information related to drug trafficking on their phones and similar storage devices, such as thumb drives. While I agree that the affidavit lacks an appropriate nexus to search the cell phone and thumb drives, I need not further address this issue because I find Detective Grimsley relied in good faith on the magistrate judge's issuance of the search warrant.[28]

Even if it is later determined that a warrant is not supported by probable cause, evidence obtained from that warrant need not be excluded if officers reasonably relied in good faith on the judge's issuance of the warrant. *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (discussing the good faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984)). Officers cannot rely in good faith on a warrant when the supporting affidavit is "so lacking in indicia of probable cause as to render [officers'] belief in its existence *entirely unreasonable*." *Carpenter*, 341 F.3d at 670 (quoting *Leon*, 468 U.S. at 923). Put another way, the issue is "whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015).

In determining the objective reasonableness of an officer's reliance on a warrant, a reviewing court looks at the totality of circumstances, including information known to officers but not presented to the judge who issued the warrant. *Id*. Good-faith reliance has been found when evidence was presented to show that officers were aware of additional information that made their reliance on the warrant objectively reasonable. *See United States v. Johnson*, 848 F.3d 872, 879 (8th Cir. 2017) (noting affiant also knew in search for sex abuse evidence that defendant was a registered sex offender, had previously

---

[28] For the same reasons, I will not address the Government's arguments that the searches were justified under the automobile exception or under a theory of inevitable discovery.

failed to register as a sex offender, lived with the victim's mother during the time of alleged abuse, and occasionally lived at the residence searched); *United States v. Pruett*, 501 F.3d 976, 981 (8th Cir. 2007) (recounting testimony of affiant at suppression hearing regarding additional information that corroborated information from an informant contained in the affidavit), *vacated on other grounds*, 552 U.S. 1241 (2008), *reinstated in relevant part*, 523 F.3d 863 (8th Cir. 2008); *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001) (discussing affiant's testimony at suppression hearing about additional surveillance at the place to be searched and that cocaine found prior to search warrant was consistent with distribution).

In the present case, Detective Grimsley knew, based on his training and experience, that drug dealers often use cell phones to conduct drug sales and purchases, and that those phones and other storage devices, including thumb drives, may contain information related to their drug activity. This knowledge, combined with the evidence seized from the vehicle and information from the CI, makes Detective Grimsley's request to search the cell phone and thumb drives reasonable. He further testified that based on his training and experience, it is common for drug dealers to carry firearms to use for protection and intimidation (the affidavit listed the firearm found on Herbst's person). Detective Grimsley also believed, as a result of his training and experience, that the money seized (and additional money Herbst said would be in the safe) constituted drug proceeds. *See id.* (citing cases for the conclusion that large amounts of United States currency may be indicative of drug trafficking). The officers were aware of additional incriminating information. Officer Loera and Sergeant Hoogendyk both testified about Herbst's nervous behavior. *See United States v. Zamora-Garcia*, 831 F.3d 979, 984-85 (8th Cir. 2016) (citing authority that nervous behavior may support a finding of probable cause). It is not clear why Detective Grimsley did not include these facts in his affidavit. Nevertheless, in light of this additional information, I cannot say that his reliance on the

warrant, including to search the phone and thumb drives, was entirely reasonable. I find Detective Grimsley acted in good faith by relying on the search warrant in this case.[29]

Finally, I keep in mind the purpose of the exclusionary rule and good-faith exception: "to deter police misconduct rather than to punish the errors of judges and magistrates." *See United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2015) (citing *Leon*, 468 U.S. at 916). I find Detective Grimsley acted appropriately by seeking a warrant to search the safe, cell phone, and thumb drives. While he could have drafted a better affidavit, I find that any deficiencies in the warrant and application rest on the issuing judge and that the suppression of evidence is not appropriate in this case.

## III.   CONCLUSION

I respectfully recommend that the district court **deny** Herbst's motion to suppress (Doc. 28).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the

---

[29] I also note that based on the additional information, the officers may have had sufficient information to establish probable cause to search the vehicle for drug-related items under the "automobile exception" to the warrant requirement prior to Odin's search of the vehicle. *See Maryland v. Dyson*, 527 U.S. 465, 466-67 (2013).

findings of fact contained therein.  *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

DATED this 21st day of December, 2017.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa