# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 17-CR-4059 |
| vs. | **ORDER REGARDING REPORT AND RECOMMENDATION** |
| DUSTIN HERBST | |
| Defendant. | |

This matter is before me on a Report and Recommendation (R&R) (Doc. No. 49) in which the Honorable Kelly K.E. Mahoney, United States Magistrate Judge, recommends that I deny defendant's motion (Doc. No. 28) to suppress. Defendant Dustin Herbst has filed objections (Doc. No. 56) to the R&R and the Government has filed a response (Doc. No. 57) to the objections, and Herbst as replied to the Government's response (Doc. No. 58).

## I.     APPLICABLE STANDARDS

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g., Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more exacting standard, even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## II.    BACKGROUND

### A.    Procedural History

On September 20, 2017, the grand jury returned an indictment (Doc. No. 2) charging Herbst with one count of possession of methamphetamine with the intent to distribute and one count of possession of a firearm in furtherance of a drug trafficking crime. Defendant filed a motion (Doc. No. 28) to suppress evidence on October 24, 2017, and the Government filed a resistance (Doc. No. 35) on October 30, 2017. Judge Mahoney conducted a hearing on December 7, 2017. The Government presented the testimony of Detective Dylan Grimsley, Officer Julian Loera and Officer Jacob Noltze from the Sioux City Police Department (SCPD), as well as expert witness Michael

Morgan. Herbst presented the testimony of expert witness Jim Pauley. The following exhibits[1] were received without objection:

| Exhibit No. | Description |
|---|---|
| 1 | video (Sergeant Hoogendyk's patrol vehicle) |
| 2 | certification records (K-9 Odin) |
| 2A | training records (K-9 Odin) |
| 2B | Dogs for Law Enforcement Bylaws & Certification Rules |
| 3A | photograph (intersection at Rustin & Paxton streets) |
| 3B | photograph (close up of Exhibit 3A) |
| A | video (Officer Loera's patrol vehicle) |
| B | Drug Enforcement Administration interview report |
| C | Sioux City Police reports |
| D | state search warrant & application |
| E1-E17 | excerpt of training records (K-9 Odin) |
| F | Curriculum Vitae of Jim Pauley |
| G | Google map printout |
| GG | Google map printout (Ex. G with handwritten notations) |

Judge Mahoney issued her R&R on December 21, 2017. On the same day, the grand jury returned a superseding indictment (Doc. No. 46) amending the charges against defendant to include an additional count of conspiracy to distribute methamphetamine. Herbst has filed an objection (Doc. No. 56) to the R&R. This matter is scheduled for jury trial on February 8, 2018.


**B.      Relevant Facts**

Herbst objects to several of Judge Mahoney's factual conclusions. *See* Doc. No. 56. Thus, I will review the record de novo to make independent findings of fact.

---

[1] For the sake of consistency with the R&R and the parties' briefs, I will refer to the exhibits using the numbers and letters assigned by the parties, rather than by their docket numbers.

On August 12, 2017, Detective Grimsley received information from a confidential informant (CI)[2] about a source of methamphetamine in the Sioux City area. Ex. C at 8. The CI identified "a white male named Dustin who is staying on S. Paxton St. . . . driving a Colorado plated gold four door car with a dent in the back bumper . . . [who] brought back a significant amount of methamphetamine and possibly cocaine from Colorado to be sold here in Sioux City." *Id.* Grimsley located the residence and the car—a gold Toyota Corolla with Colorado license plates (the Toyota)—and conducted surveillance from approximately half of a block away. Doc. No. 54 at 10. Grimsley watched Herbst exit the house and open the back seat and then the trunk of the Toyota. Ex. C at 8-9. Herbst appeared to move items around for a couple of minutes in both the back seat and the trunk. *Id.* at 9. Herbst then got into the driver's seat and drove away. Grimsley followed at a distance of approximately one block. He intended to stop Herbst's vehicle if justification arose in order to further his drug investigation. Doc. No. 54 at 31-32.

Grimsley testified that at the intersection of South Rustin and Peters, he saw Herbst "slow and roll" through the stop sign at the corner. *Id.* at 10-12, *see also* Ex. C at 9. The traffic violation was not recorded on camera or observed by any other officers. Grimsley requested that a marked patrol unit conduct a traffic stop of the Toyota for the stop sign violation. *Id.* at 9. He testified that this is his normal procedure when conducting undercover surveillance. Doc. No. 54 at 8. Officer Loera responded to the request. Within approximately one minute, Loera located the recently-parked Toyota, activated his vehicle's police lights and pulled in behind the vehicle. Ex. C at 4, *see also* Doc. No. 54 at 40, 50.

Herbst got out of his car and walked towards Loera. Doc. No. 54 at 41. He had to be told several times to get back into the car before he complied. *Id.* Herbst denied

---

[2] Grimsley testified that he has had past experience with this CI, that this CI has a history of being cooperative, reliable and truthful, and that information from this CI has previously led to the execution of search warrants and the seizure of drugs and contraband. Doc. No. 54 at 8-9. However, the CI was facing felony charges at the time of this interview. *Id.* at 27.

being the driver of the vehicle several times and initially refused to give Loera his license, insurance, and registration. *Id.* He accused Loera of trying to "put him in the driver's seat," and claimed that his girlfriend—who was not currently present—had been the driver. Ex. C at 5. During this time, Herbst was nervous and argumentative.[3] He fumbled around the car and his right knee and calf area and had to be told several times to keep his hands on the steering wheel. *Id.* Another officer, Sergeant Hoogendyk, arrived on the scene and assisted while Loera ran Herbst's license and registration. While standing beside the passenger window, Hoogendyk saw Herbst call his girlfriend and ask her to come to the scene. Ex. C at 12.

While Loera was checking Herbst's license and registration, he called a K-9 officer to the scene. Ex. C at 6. Loera learned that Herbst did not have a valid license. *Id.* Herbst's girlfriend, Jazmine Keutz, arrived on the scene and was warned by K-9 Officer Noltze, who had also just arrived with narcotics dog Odin, to stay away from the vehicle. Doc. No. 56 at 77. Loera returned to the car and asked Herbst to step out of the car. *Id.* at 12. Although Herbst did so, he stated he would not cooperate when Loera told Herbst to turn and put his hands behind his back. Doc. No. 54 at 46, Ex. C at 6, 12. Loera needed Hoogendyk's assistance to cuff Herbst. Meanwhile, Keutz reached into the front seat of the Toyota. Hoogendyk left Loera and Herbst to pull Keutz from the Toyota and Grimsley, who had been observing up to that point, came forward to assist. *Id.* at 9. Odin became increasingly agitated by the events and barked every time Herbst yelled. Doc. No. 56 at 78. A .22 caliber, Derringer-style handgun was found in Herbst's right shorts pocket during a pat-down, along with $705 in cash. Ex. C at 13. Herbst and Keutz were placed in separate patrol cars. *Id.*

Several of the facts surrounding Odin's sniff of the Toyota are disputed. Noltze testified that after he gave Odin some time to calm down, Odin led Noltze into Herbst's

---

[3] Herbst disputes that he was nervous, arguing that his alleged shaking behavior is not apparent from the video. *See* Doc. No. 56 at 2-4. However, he did not testify and the video does not clearly contradict the officers' testimony on this point.

Toyota, which was open. Ex. C at 15-16. The videos of the sniff indicate that the break lasted approximately 30 seconds. Ex. 1 at 8:34-8:59. It is also not entirely clear from the video whether Odin lead Noltze to the car or vice-versa: Ex. 1 at 8:55-8:59, Ex. A at 11:27-11:29. According to Noltze, Odin "alerted" to the presence of narcotics in two bags in the back seat of the Toyota. Doc. No. 54 at 77-79. This occurred while Odin was in the front of the Toyota. The video evidence indicates that Odin was in the front of the Toyota for only about 12 seconds. Ex. 1 at 8:59-9:11; Ex. A at 11:26-11:38.

Because it is difficult to see the inside of the vehicle through the tinted windows, it is almost impossible to determine if Odin put the front of his body in the back seat of the Toyota during that time, an occurrence that would be necessary to make Noltze's testimony plausible. Noltze testified that Odin "alerted" by scratching at the bags. *Id.* at 78. He also testified that he noticed passive alert behavior, including a change in breathing and possible drool. *Id.* at 79. Noltze does not dispute that Odin did not give a final "indication" that there were narcotics in the bags.[4] *Id.* at 78-79. He testified that this was likely due to Odin's position—he was in the front seat, with his front half extended into the backseat in a way that made it difficult for Odin to sit. *Id.* at 78-79. Noltze conceded that Odin was distracted during the search and had to be redirected several times. *Id.* at 80.

It is not clear whether Odin was rewarded for this search,[5] and no one testified clearly as to how Noltze informed the other officers that Odin had alerted to narcotics before they began searching the car. Odin reluctantly entered the Toyota a second time, this time in the back seat. He was in the back of the Toyota for less time than he was in the front seat. Ex. 1 at 10:13-10:21; Ex. A at 12:39-12:50. Noltze agrees that Odin did

---

[4] There is some argument as to the significance of Odin's "alert" versus Odin's "indication." The difference between these two signals, as well as Odin's training and reliability, will be addressed more thoroughly below.

[5] Noltze appears to tell Odin "good boy" when he exits the front seat (Ex. A at 11:37-11:39); however, the audio is not clear.

not alert a second time while he was in the back seat. *See* Doc. No. 54 at 78-79 (describing alert to narcotics in the back seat from Odin's position in the front seat) and 91 (no reported alert or indication while he was in the back seat).

The officers searched the car and seized ammunition, a cell phone, two thumb drives and two bags. One of the bags contained syringes, a straw, a baggie with crystal residue and a safe. Ex. C at 8-10. In the trunk, the officers found additional syringes and drug paraphernalia. *Id.* Herbst admitted in a post-*Miranda* statement that he was a methamphetamine user and that the safe contained additional cash. Doc. No. 54 at 17-18. At the police station, Odin conducted a second sniff of the safe in which he again alerted to the presence of narcotics. However, the record is unclear as to the details of that second sniff. Noltze testified that he "believe[d] Detective Grimsley" had placed the safe in the office for search. *Id.* at 96. Grimsley did not testify to doing so, and did not testify at all as to how the safe was placed prior to the search. *Id.* at 34-35. Grimsley's police report (Ex. C at 8-11) did not reference a second sniff. However, he described that sniff in his affidavit in support of the application for search a warrant, stating that Hoogendyk and Noltze conducted the second sniff. Ex. D at 4. Hoogendyk's report (Ex. C at 11-14) likewise says nothing about conducting the second sniff while Noltze's report states that Grimsley placed the safe in the office. *Id.* at 16.

Grimsley applied for a warrant to search the safe, cell phone and thumb drives seized from the Toyota. Ex. D. The affidavit recounted the CI's information, Grimsley's surveillance and the traffic stop. *Id.* at 4. It stated that officers found $705 in currency and a .22 caliber handgun on Herbst's person and that Odin had alerted to the presence of narcotics in the back seat of the Toyota. *Id.* It detailed all of the items found after Odin's alert and Herbst's admissions that he was a methamphetamine user and that the safe would contain additional money. *Id.* Finally, the affidavit stated that Odin again alerted to the presence of narcotics in the safe after it was seized. *Id.* However, the affidavit and the application for a warrant did not address the thumb drives or the phone, other than to state that they were seized. *See* Ex. D. The warrant was signed by a state

court magistrate. Upon execution of the warrant, officers found an additional $18,000 in the safe, along with 20 grams of methamphetamine. Ex. C at 7, 10. Although the officers did not find anything of value on the thumb drives, they found records they believed were related to drug sales on the cell phone. *Id.*

Herbst seeks to suppress the evidence seized on August 12, 2017, arguing that (1) officers lacked justification to stop his vehicle; (2) the K-9 sniff by Odin failed to provide probable cause to search a safe found inside his vehicle (or, alternatively, that the application for the warrant to search the safe was fatally defective in its description of Odin's sniff); and (3) officers lacked probable cause to search the cell phone and two thumb drives seized from the vehicle.

## C.    *The R&R*

### 1.    *The Traffic Stop*

Judge Mahoney began by determining whether there was probable cause for the initial traffic stop;

> "It is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (alteration in original) (quoting *United States v. Barry*, 98 F.3d 373, 376 (8th Cir. 1996). Iowa law requires vehicles to stop at intersections with stop signs. Iowa Code § 321.222. There is no dispute that the Toyota was required to stop at the intersection in question. *See* Ex. A. Herbst agrees that if the court finds that Detective Grimsley saw him fail to stop at the stop sign, then probable cause supports the stop. He argues, however, that Detective Grimsley's testimony should not be credited because it is not corroborated by another witness or video recording and further because of Detective Grimsley's motivation to stop the vehicle. Herbst implies that Detective Grimsley's underlying motivation (to further his drug investigation) affected what he saw that day and calls into question his testimony that he observed a traffic violation.
>
> Detective Grimsley testified that when he followed the Toyota away from the residence, he intended to stop it if justification arose to do so. When probable cause supports a traffic stop, the stop is objectively

reasonable and an officer's ulterior motive is not relevant. *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016). "Subjective intentions play no role in the ordinary, probable-cause Fourth Amendment analysis." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). This is true even if the officer would have ignored the traffic violation but for the underlying motive to stop the vehicle. *Id.*

Detective Grimsley testified that he saw the Toyota roll through the stop sign at Rustin and Paxton, rather than coming to a complete stop as required by law. He made this observation during daylight hours and from a distance of no more than one block. There is no indication that Detective Grimsley's view of the Toyota at that intersection was obscured. Nothing in this record suggests that Detective Grimsley has credibility issues or that he has provided false information in the past. Both Officer Loera and Officer Noltze each testified about hearing Detective Grimsley request a traffic stop contemporaneous to when he reported seeing the stop sign violation, which provides some corroboration for his testimony. Further, I find Detective Grimsley's testimony to be credible based on my own observations during the suppression hearing. Although, ideally, the traffic violation would have been captured on video or by a second witness, the law makes no such requirement. *See United States v. Mendoza*, 677 F.3d 822, 828 (8th Cir. 2012) (finding the credible testimony of one officer regarding apparent traffic violation sufficient to establish probable cause to conduct a traffic stop). Thus, I find probable cause existed to stop the Toyota for a traffic violation, and the stop was objectively reasonable and not in violation of the Fourteenth Amendment. *See Fuerher*, 844 F.3d at 772.

Doc. No. 49 at 10-12.

### 2. *Probable Cause to Search the Safe*

#### a. The sniff

Judge Mahoney next addressed whether Odin's sniff established probable cause to support the warrant to search the safe. Herbst attacks several aspects of the sniff: Odin's training and reliability, the fact that Odin provided an alert and not a final indication to the presence of narcotics, whether Odin actually alerted to the presence of narcotics at all, and the omission from the warrant application of the fact that Odin failed provide a final indication.

Judge Mahoney first considered whether Odin was qualified to locate narcotics. After reviewing his training and certifications, as well as Odin's admittedly spotty performance in narcotics training, she concluded that Odin had the requisite qualifications on the day in question:

> Odin has performed over one thousand training sniffs in total, and he conducts approximately ten to fifteen sniffs per month. Officer Noltze testified that Odin has improved in his ability to indicate and that he considers Odin reliable in locating narcotics. Morgan also opined that Odin is reliable in narcotics based on his review of Odin's certification and training records (Exhibits 2 and 2A), from watching the video of Odin's sniff of Herbst's Toyota, and from listening to Officer Noltze's testimony during the suppression hearing. . . . I find that the testimony of Officer Noltze and Morgan, in addition to Odin's training and certification records, demonstrate that Odin was trained and certified to detect narcotics odors on August 12, 2017. This factor weighs in favor of finding reliable his alert from August 12, 2017.
>
> ***
>
> There is no question that Odin has had issues with detecting narcotics. The relevant inquiry, however, requires consideration of his overall record to determine whether his narcotics-detection skills are trustworthy. Weighing all the evidence, I do not find that the training records support the conclusion that Odin is unreliable.

Doc. No. 49 at 15, 18.

Judge Mahoney also discussed the difference between an "alert" and an "indication" in response to Herbst's argument that an alert without an indication does not provide probable cause.

> Herbst further argues that Odin providing an alert and not a final indication means that the court cannot find probable cause existed to search the safe. He believes that this factor and the terminology used by Officer Noltze demonstrate that Odin merely showed interest and did not alert or indicate while inside the vehicle. Herbst's argument rests on the finding in *Jacobs* that, in part, a mere interest (as compared to a trained alert) cannot support a finding of probable cause. *See* [*United States v. Jacobs*, 986 F.2d 1231, 1234-35 (8th Cir. 1993)].

Morgan provided testimony consistent with that of Officer Noltze . . . about when narcotics dogs alert versus indicate. Morgan testified that for an "alert," the dog's behavior changes and its sniffing becomes more intense. He believes this is based on a dog's training, where it learned it will receive a reward if it find[s] narcotics. According to Morgan, dogs alert in different ways because they are individuals, just like humans. A handler is trained to recognize his dog's alert. Morgan testified a K-9 "indication" comes after an alert and may be shown by the dog sitting.

Morgan testified during cross examination that a narcotics dog who pushed a package around and scratched at it twice (that fact pattern outlined in *Jacobs*, except with the dog scratching rather than sniffing) would have provided an alert. He elaborated that a K-9 may show "interest" in an item but not provide a narcotics alert or indication. Morgan provided an example of a K-9 sniffing lockers at a school. The K-9 may stop to check the locker of a student who owns a cat, but that would be different than the behavioral changes associated with a narcotics alert. An alert, according to Morgan, involves a change in the K-9's behavior that occurs only with the odor of narcotics. In his experience, handlers usually give their K-9s a reward during an alert or indication, although it may depend on the situation.

In Pauley's experience, an "alert" and "indication" have the exact opposite meanings as compared to the testimony of Officer Noltze and Morgan. To him, an alert is the final step and involves a definite change in behavior where the K-9 bites or scratches at the odor source (if an aggressive-alert K-9) or sits (if a passive-alert K-9) (what Officer Noltze and Morgan described as an indication). An indication, in Pauley's experience, is a lower-level response (what Officer Noltze and Morgan described as an alert). In Pauley's training and experience, a dog that detects narcotics will do everything possible to give a final alert (or indication, according to Officer Noltze's and Morgan's terminology), which in this case would have been to sit. This is because, in Pauley's experiences, narcotics dogs learn they receive their reward only when they provide their final, trained response. Morgan provided similar testimony about a narcotics dog wanting to do what is needed to receive its reward.

I understand Herbst's concern with the terminology used in this case. Although words can matter, I do not believe that the use of the term "alert" versus "indicate" affects Odin's reliability in this case. Either term refers to a specific, trained response for Odin. I, likewise, do not believe the facts of this case are analogous to *Jacobs*, in which the narcotics dog "had not given its trained response when confronted with a package containing drugs,

coupled with the dog handler's admission that he could not say with certainty that drugs were in the package." *Jacobs*, 986 F.3d at 1235. In this case, Officer Noltze provided unequivocal testimony that Odin alerted but did not give a final indication while inside the vehicle, and he did not alert or indicate during the subsequent exterior and interior vehicle sniffs. Morgan believed that Odin alerted based on Officer Noltze's description that Odin moved toward the area, pawed at the location, and most significantly, possibly drooled. According to Morgan, that drooling (which demonstrates anticipation) provides clear evidence of an alert because it is an uncontrolled response that cannot be provoked by the handler, nor faced by the K-9. He likened this drooling to a Pavlovian response and explained it is developed during narcotics training where the K-9 learns that it will receive its reward if it finds narcotics.

Doc. No. 49 at 23-24.

With this background in mind, Judge Mahoney considered whether the circumstances of the sniff at issue—where Odin is alleged to have alerted to the presence of narcotics, but not to have provided a final indication—provided probable cause to support the application for the warrant to search the safe. Further, Judge Mahoney addressed the credibility of the officers reporting the alert, in light of Herbst's claim that Odin did not alert at all according to the video evidence.

The events in question happened outside on a warm, August day. Odin was panting according to both Officer Noltze and the video. Ex. 1 at 8:00-8:57. Officer Noltze testified that he did not believe this affected Odin's ability to detect narcotics that day. By way of contrast, the training records show that on July 11, 2017, one month prior to the Herbst encounter, Odin "was struggling due to heat," but after wrapping him in cold towels and giving him ice water, Odin "recovered quickly." Ex. 2A at 389. There is no indication that Odin required such measures here. Herbst offered the opinion testimony of Jim Pauley that Odin's panting meant he was not able to sniff properly because he was breathing to take in air rather than scent. Both Morgan and Pauley testified that narcotics K-9s are often excited to do the work they are trained for, which would imply they might breathe heavily when performing this work. In light of each of these considerations, I do not find that the heat or Odin's panting made his narcotics work unreliable on August 12, 2017.

\*\*\*

In Pauley's opinion, Officer Noltze did not provide an adequate break between the apprehension phase and the narcotics-detection phase. If faced with the same situation, Pauley would have allowed Odin a longer break of five to ten minutes, closed the driver's door to allow the odor to settle, and first conducted an exterior sniff of a different vehicle to make sure Odin had calmed down. Pauley believes that Odin was still in apprehension mode, and not narcotics-detection mode, as evidenced by his looking back toward the patrol vehicles while in the front seat of Herbst's vehicle. *See* Ex. 1 at 9:03-9:11.

Pauley also pointed to Odin not wanting to enter the back seat of the Toyota after the exterior sniff. He found that significant because in his training and experience, if a K-9 smelled the odor of narcotics once, it will want to return to that location to find the narcotics so it can get its reward. He reiterated that the video does not show Odin alert, and in his opinion, he could not tell if Odin was searching or just looking around. Both Pauley and Morgan testified that narcotics dogs become excited and do whatever is possible to give a final indication that they located the source of drugs because they know from training that when they indicate, they will receive a reward. These observations and opinions cast doubt on Odin's sniff of Herbst's vehicle.

Based on Officer Noltze's testimony, Odin's excitement was consistent with his patrol training, where he learned to engage and apprehend a suspect and also to protect his handler and other officers. Officer Noltze testified he generally allows Odin approximately five minutes to calm down before transitioning from apprehension mode to narcotics-detection mode, during which time he does not leave the area. On this day, there were approximately thirty seconds between when Herbst was arrested and placed into a patrol vehicle and when Odin jumped into the Toyota. Ex. 1 at 8:29-8:58. Officer Noltze believes, however, that Odin noticeably calmed down when Herbst and his girlfriend were placed into patrol vehicles. He described Odin's energy level as "middle of the road," and this disposition allows Odin to calm more quickly than higher-energy dogs. Officer Noltze's testimony appears to be consistent with the video evidence. *Compare* Ex. 1 at 7:18, 8:21 (Odin tense and barking, *with* Ex. 1 at 8:00, 8:29 (Odin less tense), *and* Ex. 1 at 8:57 (Odin calmer and walking around Officer Noltze). Morgan also opined that, based on the video, Officer Noltze did a good job of settling Odin and then conducting the narcotics sniff. Officer Noltze did not state whether he thought the short duration of the transition period or Odin's distraction

affected his narcotics detection ability, but he did testify he believed Odin was reliable.

Officer Noltze testified that he believed air flow in the Toyota would have "absolutely" affected odors in the vehicle. Both Morgan and Pauley agreed that this type of factor can affect a dog's ability to detect odor. This could perhaps explain why Odin alerted while in the front seat but failed to do so on the exterior or in the back seat of the Toyota. One of Odin's training records, from February 2014, shows that he was distracted during training, and he had "to be redirected to sniff vehicles." Ex. E-15 at 2. This resulted in Odin missing narcotics during the first pass around the vehicle, but he thereafter found the hidden drugs. *Id*. This factor demonstrates that Odin being distracted may have made his narcotics search less reliable, but that lack of reliability would make it more likely he would miss (rather than provide a false-positive alert for) the odor of narcotics. This factor also could possibly explain why Odin provided no alert or indication while searching the exterior of the Toyota.

I have concerns about Odin's alert, based primarily on the short duration he was inside the Toyota, his apparent distraction during the search, and his disinterest in continuing to search the vehicle. These factors call into serious question the reliability of his reported alert. I believe the testimony from Morgan and Officer Noltze, in addition to Odin's training records, demonstrate that Odin did not provide a final indication because of the small space inside the vehicle, and because (as Officer Noltze testified) doing so would have moved his nose farther away from the odor. The final issue, therefore, lies in whether to credit Officer Noltze's testimony that Odin alerted while in the front seat. I have considered each of the issues discussed above, in addition to my observations of Officer Noltze while he testified. As with Detective Grimsley, there is no indication that Officer Noltze has provided false information in the past or has other credibility issues. His testimony was unwavering, and he candidly acknowledged Odin's flaws. For these reasons, I credit his testimony about Odin's alert while inside the Toyota. I believe this finding is further supported by additional evidence. After he finished the vehicle search with Odin, Officer Noltze spoke with Detective Grimsley and immediately began searching the vehicle. Detective Grimsley testified that he understood Odin had alerted for narcotics in the back seat of the Toyota. *See* note 9, *supra*. Both he and Sergeant Hoogendyk assisted Officer Noltze in searching the Toyota. There is no indication that Officer Noltze was hesitant or uncertain whether Odin had alerted inside the Toyota. Ultimately, although I question some of the circumstances surrounding Odin's search at the scene, I believe the

overall testimony explains Odin's actions and provides an understanding for the significance of what occurred during that sniff.

Finally, Herbst also points to the fact that you cannot see Odin alerting from the video. He further argues that Officer Noltze does not appear to praise Odin for providing a false alert. Herbst appears to assert through these arguments that Officer Noltze's testimony cannot be believed. Similar to the traffic stop, a narcotics dog's alert need not be captured on camera to have occurred. The evidence is not clear whether Officer Noltze praised Odin for his purported alert inside the Toyota. Both Morgan and Pauley testified they did not see that Officer Noltze rewarded Odin for providing an alert. Although the video likewise does not show Officer Noltze giving Odin physical affection or a toy reward, Officer Noltze and Odin are off camera when he returns Odin to his patrol vehicle after the search. It is possible that Officer Noltze rewarded Odin at that point, although there is no testimony to support such a conclusion. The audio from the video is also not definitive; although it does not clearly show Officer Noltze verbally praising Odin, it appears that he may have said "good boy" when Odin exited the Toyota's front seat. *See* Ex. 1 at 9:11. It could be possible that Odin did not receive praise because he only provided an alert and not a final indication, he had not completed the vehicle search after exiting the front seat, and/or he was distracted and did not alert or indicate after the additional search. Because the record on this issues is not clear, I decline to weigh this factor in my analysis.

Doc. No. 49 at 20-26. Judge Mahoney concluded that, although the sniff at issue may not have conformed to best practices, the totality of the circumstances support a finding that Odin provided a reliable, positive alert for the odor of narcotics in Herbst's Toyota, establishing probable cause in support of the warrant to search the safe.

### b. *Omission of the failure to indicate in the search warrant*

In addition to attacking the reliability of Odin's sniff, Herbst argues that Grimsley's failure to inform the state court magistrate that Odin had only "alerted" to the presence of narcotics and not provided a final indication also undermined the validity of the warrant. Judge Mahoney found that the omission did not detract from her finding that the alert established probable cause to search the safe:

There is no evidence that Detective Grimsley acted intentionally in excluding Odin's failure to indicate in the search warrant affidavit. Therefore, I will examine whether he made the omission with reckless disregard that the omission made the affidavit misleading. Reckless disregard can be inferred from the fact that information was omitted, but only when the defendant shows the omitted information "would be 'clearly critical to the finding of probable cause.'" [*United States v. Gonzalez*, 781 F.3d 422, 431 (8th Cir. 2015)] (referring to the holding in *Jacobs*, 986 F.2d at 1235).

Herbst again relied on *Jacobs*, in which the court found the affiant acted with reckless disregard because he knew the narcotics dog showed only an "interest" in the package to be searched and failed to provide a trained response (an alert), and the dog's handler was not certain whether the package would contain drugs. *Jacobs*, 986 F.2d at 1234-35. It would have been prudent for Detective Grimsley to clarify that Odin had alerted but failed to provide a final indication while inside the vehicle. Nothing shows, however, that Detective Grimsley was aware of this distinction. To the contrary, he testified he had never received K-9 training and had minimal familiarization with the precise technology used by K-9 handlers. For this reason, I do not find significance in Detective Grimsley's choice of words for the affidavit. The testimony was consistent between Officer Noltze and Detective Grimsley that Odin had provided a positive alert to the odor of narcotics inside the vehicle, consistent with his training, and which the officers believed provided probable cause to search the vehicle. Although Herbst urges the court to not credit this testimony, for the reasons discussed in the preceding section, I find Officer Noltze's testimony to be credible.

I believe this case is more similar to the facts in *United States v. Holleman* than *Jacobs*. In that case, the Eighth Circuit noted that other courts "have held a trained drug dog's 'alert,' as opposed to the more conclusive 'indication,' is enough to establish probable cause" to search property. *Holleman*, [743 F.3d 1152, 1156 (8th Cir. 2014)] (citing *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009); *United States v. Clayton*, 347 F. App'x 497, 502 (5th Cir. 2010)). The court determined that when a K-9 provided a clear alert to the odor of narcotics, but not a final indication, and his handler provided sufficient explanation for why the K-9 did not provide a final indication, probable cause supported the search. *Id.* at 1156-57.

In the present case, Odin showed more than mere interest in the vehicle. Based on this record and my findings set forth above, Odin provided an alert to the odor of narcotics, which was a trained response, and failed only to provide a final indication that he had found the source of that odor. . . . Accordingly, I do not find the omitted information was material to the finding of probable cause.

Doc. No. 49 at 27-29.

### 3. *Probable Cause to Search the Cell Phone and Thumb Drives*

Turning to Herbst's challenge to the search of the cell phone and thumb drives, Judge Mahoney first considered whether there was probable cause to issue the warrant for those items. Judge Mahoney found that probable cause was lacking based on the warrant and affidavit. However, she concluded that Grimsley relied on the warrant in good faith, such that the evidence is not subject to being suppressed:

Herbst challenges the search of the cell phone and thumb drives by arguing that Detective Grimsley's affidavit fails to establish probable cause to search those items. The affidavit recounted the CI's information, Detective Grimsley's surveillance, and the traffic stop. It stated that officers found $705 in United States currency and the .22-caliber handgun for which Herbst did not provide a permit to carry. With regard to Odin's search, the affidavit included the following: "K-9 Officer Jake Noltze and his K-9 Odin conducted a sniff of the vehicle. Odin alerted to the presence of narcotics in the back seat." Ex. D at 4. The affidavit then listed the items found after Odin's alert: syringes, a baggie with white residue that field-tested positive for methamphetamine, a safe or lockbox (located under the container in which they found the syringes and methamphetamine residue), .22-caliber ammunition, the cell phone, and two thumb drives. Detective Grimsley included Herbst's statements of being a methamphetamine user and that the safe would contain additional money. Finally, the affidavit stated, "K-9 Odin alerted to the odor of narcotics on the safe again" back at the police department. *Id.* While this information provides probable cause to search the safe, it does not address the cell phone and thumb drives, aside from saying they were seized from the vehicle.

As a preliminary matter, it is not clear what items the search warrant authorizes officers to search for. On the first page of the warrant application, Detective Grimsley checked boxes, among others, indicating

17

that the property to be searched "has been obtained in violation of the law" and "the possession of which is illegal." Ex. D at 3. Another checked box states the property was used or intended to be used "as the means of committing a public offense." Ex. D at 3. Aside from the information in the affidavit, the application contains no mention of which public offenses were being committed through the use of the property to be searched. Nor does the search warrant itself specify such offenses—it states only the property "has been used in committing violations of the laws of this state." Ex. D at 2. In the affidavit, Detective Grimsley stated the '[i]tems to be searched for have been previously mentioned in [the] search warrant application." Ex. D at 4. There is no other indication, in either the application or the search warrant itself, which particular items officers would be searching for inside the safe or on the cell phone or thumb drives. Because of the failure to include which laws were violated, what particular items are being searched for, or even belief statements by Detective Grimsley that probable cause existed to search the property for certain types of evidence, it is unclear from the faces of the search warrant and application (without making inferences from the supporting affidavit) whether the warrant authorized a search for drugs, firearms, child pornography, evidence of financial fraud, or other items and information.

More specifically, Detective Grimsley failed to include information to show why the cell phone and thumb drive would likely contain evidence of a particular crime. This despite his testimony that based on his training and experience, drug traffickers often use cell phones and store information related to drug trafficking on their phones and similar storage devices, such as thumb drives. While I agree that the affidavit lacks an appropriate nexus to search the cell phone and thumb drives, I need not further address this issue because I find Detective Grimsley relied in good faith on the magistrate judge's issuance of the search warrant.

\*\*\*

In the present case, Detective Grimsley knew, based on his training and experience, that drug dealers often use cell phones to conduct drug sales and purchases, and that those phones and other storage devices, including thumb drives, may contain information related to their drug activity. This knowledge, combined with the evidence seized from the vehicle and information from the CI, makes Detective Grimsley's request to search the cell phone and thumb drives reasonable. He further testified that based on his training and experience, it is common for drug dealers to carry firearms to use for protection and intimidation (the affidavit listed the firearm found

on Herbst's person). Detective Grimsley also believed, as a result of his training and experience, that the money seized (and additional money Herbst said would be in the safe) constituted drug proceeds. *See id.* (citing cases for the conclusion that large amounts of United States currency may be indicative of drug trafficking). The officers were aware of additional incriminating information. Officer Loera and Sergeant Hoogendyk both testified about Herbst's nervous behavior. *See United States v. Zamora-Garcia*, 831 F.3d 979, 984-85 (8th Cir. 2016) (citing authority that nervous behavior may support a finding of probable cause). It is not clear why Detective Grimsley did not include these facts in his affidavit. Nevertheless, in light of this additional information, I cannot say that his reliance on the warrant, including to search the phone and thumb drives, was entirely [un]reasonable.[6]

Doc. No. 49 at 31-32 (footnote and modification added). After concluding that the officers relied on the warrant in good faith, Judge Mahoney determined it was not necessary to consider other arguments raised by the Government, including the automobile and inevitable discovery exceptions. *Id.* at 31 n.28.

## III. DISCUSSION

### A. The Vehicle Stop

Herbst's first objection is to Judge Mahoney's finding that there was probable cause to stop the Toyota because Grimsley observed a traffic violation. Herbst argues:

[Grimsley] was intent on stopping the vehicle because a confidential source ("CS") had told him that Mr. Herbst was engaged in drug trafficking. No one other than Detective Grimsley witnessed the alleged violation, and Detective Grimsley lacked a dash camera that could have corroborate the violation or proven that it did not occur. Moreover . . . there are ample

---

[6] The statement that "I cannot say that his reliance on the warrant, including to search the phone and thumb drives was entirely reasonable" appears to include a typographical error, with "reasonable" inadvertently substituted for "unreasonable." I base this belief on Judge Mahoney's conclusion that suppression is not necessary and this statement from the following paragraph in the R&R: "While he could have drafted a better affidavit, I find that any deficiencies in the warrant and application rest on the issuing judge and that the suppression of evidence is not appropriate in this case." Doc. No. 49 at 33.

bases to question the credibility of the various officers' testimony at the suppression hearing.

Doc. No. 56 at 2.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810; *see also Lyons*, 486 F.3d at 371 ("[I]t is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.") (alteration in original) (quoting *Barry*, 98 F.3d at 376)). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," therefore, if probable cause supports the stop, the officer's underlying motivation is not relevant. *Fuehrer*, 844 F.33d at 772 (quoting *Whren*, 517 U.S. at 813). There is no requirement of extrinsic proof that a traffic violation occurred, rather, one officer's credible testimony may be sufficient to establish probable cause. *Mendoza*, 677 F.3d at 827-28.

As Judge Mahoney correctly found, the failure to completely stop the forward momentum of a car at a stop sign is a violation of Iowa Code § 321.322. Grimsley noted the failure to stop both in his police report and in his testimony during the December 7, 2017 hearing. The violation occurred during daylight hours, and was observed from about a block away. Herbst makes no argument that Grimsley would not have been able to see the car, the driver, the stop sign or the intersection; rather he relies on the fact that there is no corroborating evidence and that Grimsley had an ulterior motive—furthering his drug investigation—to search the Toyota. Herbst presented no evidence that Grimsley has been dishonest in the past. Nor was Grimsley impeached during the hearing. By contrast, Herbst lied during the traffic stop by claiming that Keutz was the one driving the car—a claim Keutz denied once she arrived on the scene in a separate car. Herbst additionally claimed to have captured the traffic stop on camera but produced no video evidence suggesting that the traffic violation did not happen.

Grimsley watched Herbst exit a house and drive away in the Toyota. He followed Herbst from the beginning to the end of the trip. His explanation of the events from the

time he made the initial police report until the December 7, 2017, hearing have been both consistent and plausible. Thus, I agree with Judge Mahoney that Grimsley's testimony establishes that there was probable cause to stop the Toyota due to a stop sign violation. Herbst's objection to the R&R is overruled on this issue.

## B.    *The Search of the Safe*

Herbst makes several objections related to Judge Mahoney's findings of facts and legal conclusions surrounding the issue of whether there was probable cause to search the safe seized from Herbst's Toyota. I will address each objection individually.

### 1.    *Herbst's behavior during the traffic stop (Objection No. 2)*

Herbst objects to Judge Mahoney's conclusion that he was nervous during the traffic stop, arguing instead that although he was argumentative at times, the video proves that he was calm. *Id.* at 3. Herbst argues that "[t]he contention that [he] was 'nervous' smacks of a post-hoc justification for the dog sniff. Indeed, Officers Loera and Jacob Noltze . . . provided inconsistent testimony as to why the dog sniff was conducted." *Id.* As a result, Herbst claims, the evidence that he was nervous should not be considered in determining whether or not the officers executed the warrant in good faith in spite of other alleged shortcomings in the warrant process.

There is more evidence that Herbst was nervous than evidence that he was calm. In his investigative report, Loera indicated that Herbst "seemed very nervous and he was shaking and kept reaching around the vehicle into multiple spots of the vehicle." Ex. C at 6. Loera testified consistently at the December 7, 2017 hearing. *See* Doc. No. 54 at 42 ("[I]t seemed like he was nervous the entire time shaking, looking around the vehicle, digging in certain spots"). Notably, Loera testified that Herbst kept touching or reaching towards the side of his right leg or calf – near where officers later found a concealed

firearm.[7]  *Id.* at 43, 46-47.  Hoogendyk also reported that Herbst "was visibly shaking. His arms were shaking significantly.  His legs were shaking as he was in the seat.  He appeared to be very stressed out at this time and worked up . . . He also continued to shake and be nervous while sitting in the driver's seat."  Ex. C at 12.  The fact that the dash cam videos (which do not clearly show the inside of the Toyota) do not depict this shaking and nervous behavior does not compel the conclusion that the officers were dishonest in their descriptions of Herbst's actions.  Nor does the fact that Herbst engaged Hoogendyk in conversation during the stop.  Further, Herbst's violent outburst when the officers informed him he would be arrested weighs heavily in favor of finding that Herbst was not calm during this encounter.

Herbst's contention that his alleged nervousness "smacks of a post-hoc justification for the dog sniff" does not address any relevant issues in this matter.  When officers commence a valid traffic stop, there is no requirement that there be probable cause to search for drugs or other contraband before a drug dog is deployed.  *See Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005) ("[T]he use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicated legitimate privacy interests."); *United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007) (same). The stop of the Toyota and the subsequent sniff were lawful, regardless of whether Herbst was nervous.   The officers did not need to justify the fact that they brought Odin to the scene, as Herbst was lawfully detained for committing a traffic violation (and subsequently for driving without a valid license).   Judge Mahoney did not err in concluding that Herbst was nervous, and that his nervousness is relevant to determining, if necessary, whether the officers relied in good faith on the warrant.  *See, e.g., United States v. Jones*, 269 F.3d 919, 928 (8th Cir. 2001) ("We have concluded that nervousness combined with several other more revealing facts can generate reasonable suspicion."

---

[7] Herbst was charged with carrying a dangerous weapon prior to his indictment on federal charges.  Ex. C at 4.

(citing *United States v. Foley*, 206 F.3d 802, 804 (8th Cir. 2000); *United States v. Lebrun*, 261 F.3d 731, 733 (8th Cir. 2001))). Herbst's objection to the R&R is overruled on this issue.

### 2. *Odin's alert to the presence of narcotics at the scene (Objection No. 3)*

Herbst next objects to Judge Mahoney's conclusion that "Odin provided a . . . positive alert for the odor of narcotics during the first sniff of the Toyota being driven by Herbst." Doc. No. 56 at 5. Herbst argues that "irrefutable video evidence shows that Odin simply did not alert." *Id.* Herbst goes on to analyze screenshots of Exhibit A that, he contends, show that Odin did not stick his head into the back seat of the car, thus making the alert Noltze described factually impossible. *Id.* at 6-9.

It is difficult to tell from the video at issue whether Odin reached his head into the back seat to provide the alert described by Noltze. Exhibit A shows that Odin was in the front seat of the car for only about 12 seconds. He spent about one second looking out the front passenger's window. Ex. A at 11:27-11:28. He then turned in a counter-clockwise direction towards the front of the car, with his head out of sight for a few seconds. *Id.* at 11:29-11:32. Herbst contends that Odin turned only 90 degrees and therefore was facing the front, rather than the back of the car. Doc. No. 56 at 6. However, this is not clear from the video. The dark headrests of the driver's and passenger's seats appear on the video to be the same color as Odin, making it impossible to accurately track the movement of his head. It is possible that he turned more than 90 degrees and reached his head into the back seat for his (necessarily brief) alert.

In short, Exhibit A does not refute Noltze's testimony that Odin placed his head in the back seat. It is simply impossible to prove or disprove that testimony based on this video. The same is true with regard to the second video, Exhibit 1. Herbst argues that Exhibit 1 shows Noltze focusing only on the back seat while Odin is in the front seat. However, Odin's positions and movements while in the front seat are not clear.

Judge Mahoney ultimately credited Noltze's testimony, finding that "his testimony was unwavering, and he candidly acknowledged Odin's flaws."[8] Doc. No. 49 at 25. Further, other officers at the scene understood that Odin had alerted for narcotics in the back seat of the Toyota. As with the traffic stop discussed above, the fact that the alert did not occur on camera does not compel the conclusion that it did not occur at all. Noltze has not been shown to have a history of dishonesty, either in court or in his policing. Based on my de novo review of the record, I credit his testimony that Odin exhibited the described behaviors—sniffing, scratching, and possibly drooling on the bag at issue.

Of course, this does not end the analysis. As Judge Mahoney noted in the R&R, there is some dispute in this case over the meanings of the words "interest," "alert," and "indication," and whether Odin's observed behavior amounted to any of these. As a result, I must consider whether the behavior Noltze described was a sufficient communication of Odin's findings to provide probable cause to support the warrant to search the safe. Herbst disputes that the behavior Noltze described was an alert. Noltze testified that Odin typically alerts by a combination of sniffing, scratching at, and mouthing on the location where the narcotics are hidden. Doc. No. 56 at 63-64. His testimony was consistent with that of the Government's expert, Morgan, who testified that K-9 officers are trained to recognize changes in behaviors that indicate a dog has found drugs, rather than just that the dog has an interest in the job at hand. Morgan testified that the behavior Noltze described constituted "a good, positive alert" because these behavior changes occur as a sort of Pavlovian response. *Id.* at 129-30. Both Noltze and Morgan distinguished "alert" behavior from a "final indication," in which the dog is trained to sit so that they can receive their reward. *Id.* at 63; 122-23. Pauley, Herbst's

---

[8] Herbst argues that Officer Noltze was not candid in his responses about Odin's shortcomings; however, the record reflects that Officer Noltze admitted to various rough spots in Odin's training record.

expert, testified that he looked for similar behaviors in an alert: breathing, biting and scratching. *Id.* at 147.

Like Judge Mahoney, I conclude that the difference between an "alert" and an "indication" is not constitutionally relevant here. What matters is whether Noltze was able to determine, based on his own training and based on Odin's training, whether Odin had detected narcotics. *See Holleman*, 743 F.3d at 1157 (the proper inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." (citing *Florida v. Harris*, 568 U.S. 237, 248 (2013))). Two Eighth Circuit cases are illustrative. In *Jacobs*, the evidence established that the K-9 examined all of the packages and showed an interest in the defendant's package by pushing it around with his nose and scratching it twice. 986 F.2d at 1233. However, the K-9's trainer testified that this was not an alert, such that he could not be sure that the package contained drugs. *Id.* This uncertainty—which was omitted from the warrant application—was fatal. *Id.* However, in *Holleman*, the handling officer testified that the K-9 gave "two definitive 'alerts,'" negating the uncertainty that undermined the probable cause finding in *Jacobs*. 743 F.3d at 1156-57. In holding that the alerts without a final indication resulted in probable cause, the Eighth Circuit relied on the Fifth Circuit's refusal in *Clayton* to guess as to the proper means for a drug dog to communicate with its handler:

> [O]ur Fourth Amendment jurisprudence does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers. So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of drugs.

*Holleman*, 743 F.3d at 1156 (citing 374 Fed. App'x 497, 502 (5th Cir. 2010)).

*Holleman* is controlling. There has been no showing here that Noltze was uncertain about whether or not Odin alerted. As in *Holleman* and *Clayton*, I will not

evaluate whether Odin should have used a different method to communicate his findings to Noltze. Herbst's objection is overruled on this issue.

### 3. *Odin's reliability and the circumstances of this sniff (Objection No. 4)*

Next, Herbst objects to Judge Mahoney's finding that Odin's sniff was reliable. Herbst argues that "the Court should conclude that the circumstances surrounding the sniff undermine its reliability," relying on evidence relating to "(1) Odin's training performance, and (2) the environmental factors surrounding the sniff." Doc. No. 56 at 13. An unreliable sniff is not the basis for probable cause. The standard for relying on a narcotic's dog's sniff is flexible and depends on the totality of the circumstances. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris*, 568 U.S. at 246.

Although Odin has been certified and is re-certified annually for narcotics work and apprehension (Exs. 2, 2A); Herbst argues that Odin's documented problems with locating narcotics undermine his reliability. Odin has committed the following errors under controlled training conditions:

"Needs improvement" in narcotics work:
August 21, 2017 (Ex. E1 at 1),
August 14, 2017 (Ex. E2 at 1),
July 10, 2017 (Ex. E3 at 1),
November 21, 2016 (Ex. E5 at 1),
October 10, 2016 (Ex. E6 at 1),
June 21, 2016 (Ex. E7 at 1),
May 9, 2016 (Ex. E8 at 1),
August 8, 2015 (Ex. E11 at 1),
February 12, 2014 (Ex. E15 at 1),
January 13, 2014 (Ex. E16 at 1),
January 6, 2014 (Ex. E17 at 1)

"Alert with no indication":
August 14, 2017 (Ex. E2 at 2),
July 10, 2017 (Ex. E3 at 2),
June 27, 2016 (Ex. E7 at 2),
May 9, 2016 (Ex. E8 at 2),

September 3, 2015 (Ex. E9 at 1),
August 8, 2015 (Ex. E11 at 1),
March 3, 2015 (Ex. E12 at 2)

"False positive":
July 10, 2017 (Ex. E3 at 2),
October 10, 2016 (Ex. E6 at 2),
May 9, 2016 (Ex. E8 at 2),
September 3, 2015 (Ex. E9 at 1),
March 3, 2015 (Ex. E12 at 2)

"Missed narcotics":
November 21, 2016 (Ex. E5 at 2),
June 27, 2016 (Ex. E7 at 2),
August 10, 2015 (Ex. E10 at 2),
January 13, 2014 (Ex. E16 at 2),
January 6, 2014 (Ex. E17 at 1)

Additionally, notes throughout Odin's training records indicate that he was distracted or needed redirection. However, the records also indicate that Odin was able to locate the narcotics after redirection.

At the surface, Odin's documented errors and issues regarding narcotics detection are concerning. However, the list of errors covers a period of over three years. The evidence indicates that, during that time, Odin has performed over 1000 sniffs. This lengthy experience, when combined with the fact that he has been able to achieve re-certification as a narcotics dog on an annual basis, substantially outweighs the flaws depicted in Odin's records. Odin's training records do not demonstrate that he is unreliable.

Herbst further argues that the environmental factors present during this particular sniff rendered the sniff unreliable. Herbst argues that "Officer Noltze . . . fail[ed] to give Odin an adequate break between the excitement of 'apprehension mode' (when he was used to help arrest Mr. Herbst and his girlfriend) and 'narcotics detection.'" Doc. No. 56 at 14. Even if this is true, the fact that Noltze may not have used best practices

is not enough on its own to undermine probable cause, which must be determined based on a totality of the circumstances.

Herbst also contends that the video evidence demonstrates that Odin was panting and hot during the search, undermining his ability to properly detect narcotics. *Id.* at 14-15. However, Herbst points to only one record out of the multitude of training logs in evidence to suggest that Odin struggles when he is hot. The fact that Odin was panting during the events at issue in this case does not outweigh Odin's years of training and history of successful narcotics detection.

Odin's sniff may not have been executed perfectly, but probable cause does not require perfection. The question is whether, considering all of the facts and circumstances surrounding Odin's alert, a reasonably prudent person would believe that a search would reveal contraband or evidence of a crime. *Holleman*, 743 F.3d at 1158. That standard is met here. Herbst's objection is overruled on this issue.

### 4.  *The second sniff of the safe at the police station (Objection No. 5)*

Herbst objects to Judge Mahoney's conclusion that "Herbst does not question th[e] second sniff of the safe or that Odin provided an indication on the safe" at the police station. Doc. No. 49 at 26 (modification in original). Herbst contends that "Officer Noltze's testimony during the suppression hearing was generally not credible," and was further inconsistent with other evidence about what happened at the police station. Doc. No. 56 at 15-16. Herbst argues that these inconsistencies should preclude a finding that the sniff at the police station occurred. *Id.* at 17.

For the same reasons that I have accepted the officers' testimony regarding the vehicle stop and the sniff, I accept their testimony on this issue. Clearly, there are omissions and inconsistencies in the officers' reports as to who placed the safe in the police station. However, I find credible Noltze's testimony that Odin conducted a second sniff on the safe and alerted again to the presence of narcotics. Herbst's objection is overruled on this issue.

### 5. *False information or omissions from the warrant application (Objection No. 6)*

Finally, Herbst objects to Judge Mahoney's finding that the warrant did not contain false representations or material omissions. Herbst contends the following statements from the warrant application constitute false representations:

> The vehicle then went West on Peters Avenue and committed a stop sign violation at Peters Avenue and S. Rustin St.

> Odin alerted to the presence of narcotics in the back seat.

> K-9 Officer Noltze and Sgt. Hoogendyk moved the safe into an office setting at the police Department. K-9 Odin alerted to the odor of narcotics on the safe again.

Ex. D at 4. Further, Herbst argues that the warrant omitted the critical information that "Odin failed to provide an indication for the presence of narcotics during the first sniff . . . [and] failed to describe Odin's supposed alert, which is significant because it sounds much like the *non-alert* described in *Jacobs*. *See* 986 F.2d at 1233." Doc. No. 56 at 17-18. Herbst argues that these statements were made with a reckless disregard for the truth at a minimum, as Grimsley was the source of much of the information. As a result, Herbst contends, the good faith exception to the warrant requirement under *Franks v. Delaware*, 438 U.S. 154 (1978), no longer applies. *Jacobs*, 986 F.2d at 1235.

My findings above preclude a finding in Herbst's favor on this issue. I do not find that any of the three statements set out above are false or misleading. Further, based on my own review of the record, I do not find that Judge Mahoney erred in determining that the alleged omission—that Odin alerted, but did not provide a final indication to the presence of narcotics—undermined the validity of the warrant. As the Eighth Circuit established in *Holleman*, a valid alert can provide probable cause to support a warrant. 743 F.3d at 1157-58. Herbst's objection is overruled on this issue.

*C.*     ***The search of the Cell Phone and Thumb Drives (Objection No. 7)***

Herbst next objects to Judge Mahoney's conclusion that the good faith exception to the warrant requirement overcomes the "lack [of] an appropriate nexus to search the cell phone and thumb drives." Herbst argues that the "supporting affidavit is so lacking in indicia of probable cause as to render officers' belief in its existence *entirely unreasonable*." Doc. No. 56 at 18 (citing *United States v. Lopez-Zuniga*, No. CR17-4009-LTS, Doc. No. 32 at 9 (N.D. Iowa Aug. 10, 2017)). Thus, Herbst contends, the good faith exception to the warrant requirement does not apply.

When it is later determined that a search warrant was not supported by probable cause, evidence obtained via that warrant need not be excluded if officers reasonably relied in good faith on the judge's issuance of the warrant. *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (discussing the good faith exception as outlined in *United States v. Leon*, 468 U.S. 897 (1984)). To determine whether an officer's reliance on a warrant was objectively reasonable, the court considers the totality of the circumstances, including information known to officers but not presented to the judge who issued the warrant. *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015). Officers cannot rely in good faith on a warrant when the supporting affidavit is "so lacking in indicia of probable cause as to render [officers' belief in its existence *entirely unreasonable*." *Carpenter*, 341 F.3d at 670 (quoting *Leon*, 468 U.S. at 923). The issue is "whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *Jackson*, 784 F.3d at 1231.

I find no error in Judge Mahoney's determination that the warrant application did not provide probable cause to search the cell phone and thumb drives. While the information provided in the application provided probable cause to search the safe (describing drug paraphernalia, the sniff of the safe, the large amounts of cash and the handgun), it did not address the cell phone and thumb drives other than to state that they were seized from the vehicle. Judge Mahoney accurately concluded that "[b]ecause of the failure to include which laws were violated, what particular items are being searched

for, or even belief statements by Detective Grimsley that probable cause existed to search the property for certain types of evidence, it is unclear from the faces of the search warrant and application (without making inferences from the supporting affidavit) whether the warrant authorized a search for drugs, firearms, child pornography, evidence of financial fraud, or other items and information." Doc. No. 49 at 30.

However, several cases demonstrate that officers can overcome the lack of probable cause supporting a warrant by testifying to the facts they relied on in seeking the warrant, thus establishing that their reliance on the warrant was in good faith. "In assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, *including any information known to the officer but not included in the affidavit*." *United States v. Schermerhorn*, 71 F. Supp. 3d 948, 959 (E.D. Mo. 2014) (quoting *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007) (emphasis added)); *see also United States v. Pruett*, 501 F.3d 976, 981 (8th Cir. 2007) (recounting testimony of affiant at suppression hearing regarding additional information that corroborated information from an informant contained in the affidavit), *vacated on other grounds*, 552 U.S. 1241 (2008), *reinstated in relevant part*, 523 F.3d 863 (8th Cir. 2008); *Johnson*, 848 F.3d at 870 (noting affiant also knew in search for sex abuse evidence that defendant was a registered sex offender, had previously failed to register as a sex offender, lived with the victim's mother during the time of alleged abuse and occasionally lived at the residence searched); *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001) (discussing affiant's testimony at suppression hearing about additional surveillance at the place to be searched and that cocaine found prior to search warrant was consistent with distribution).

Here, Grimsley testified that based on his training and experience, drug traffickers often use cell phones and storage devices such as thumb drives to store information related to drug trafficking. *See* Doc. No. 54 at 18-19. This information, combined with the other information the officers knew at the time of the traffic stop, or learned during and after that stop, demonstrates good faith reliance on a technically-deficient warrant as it

supplies the factual information necessary to establish probable cause. Herbst's objection to the R&R is overruled on this issue.[9]

## IV.    CONCLUSION

1.    For the reasons set forth herein, I **adopt** the Report and Recommendation (Doc. No. 49) **without modification**.

2.    Defendant's objections (Doc. No. 56) to the Report and Recommendation are **overruled**

3.    Defendant's motion (Doc. No. 28) to suppress evidence is **denied**.


**IT IS SO ORDERED.**

**DATED** this 16th day of January, 2018.


_____
Leonard T. Strand, Chief Judge

---

[9] Based on my findings and conclusions, as set forth in this order, Herbst's objection no. 8, which addresses the automobile exception to the search warrant requirement, is **denied as moot**.